[Crim. No. 4558. In Bank. Dec. 11, 1945.]

In re WILSON DE LA ROI, on Habeas Corpus.

Alphonse Matthews and Rosalie S. Asher for Petitioner.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, John Q. Brown, District Attorney (Sacramento), and Albert H. Mundt, Chief Deputy District Attorney, for Respondent.

EDMONDS, J.—Wilson De La Roi was found guilty of the murder of William Deal and the judgment of conviction imposing the death penalty was affirmed. (*People* v. *De La Roi*, 23 Cal.2d 692 [146 P.2d 255, 151 P.2d 837].) Later, upon a petition in behalf of De La Roi asserting that his conviction was obtained upon perjured testimony offered by the State with the knowledge that it was false, this court issued a writ of habeas corpus. After the filing of the return to the writ, a referee was appointed to take testimony upon the issues of fact presented by these pleadings. The petitioner has excepted to the referee's findings, which are adverse to him in every particular, and the question now presented for decision concerns the sufficiency of the evidence to support the charge concerning the violation of constitutional rights.

The allegations of the petition are that "said perjured testimony was that of James Allen and Stanley Robinson, who appeared . . . as material witnesses for the . . . State of California; that said false testimony was procured by Stephen B. Nowakowski, then . . . Secretary to the Warden of Folsom State Prison, by means of promises of special privileges and immunities to said James Allen and Stanley Robinson; that said testimony was known by Stephen B. Nowakowski, acting as said Secretary and as a representative of the People of the State of California, to be false. . . . That applicant did not know, and could not with due diligence have ascertained, the facts hereinabove set out concerning the knowing use of said perjured testimony at the time that his appeal was taken to this Honorable Court." As a part of

the petition, there are supporting affidavits by Allen and Robinson.

The killing of Deal occurred in the State Prison at Folsom, where he and De La Roi were fellow convicts. With the exception of Lawrence C. Roosevelt, laundry superintendent, who did not see the stabbing, each of the persons who testified at the trial of De La Roi concerning the circumstances under which the crime was committed was an inmate of the prison. As a witness for the State, Allen declared that he was playing a game of checkers with Robert M. Trauger in the laundry, where both men were employed. He saw De La Roi walk into the room and step over to Deal, who was making coffee. No one else was near. As Deal bent down, De La Roi "sliced" him with a knife. The witness recounted Deal's last acts, and the departure of his assailant from the laundry.

Allen's testimony was corroborated substantially by the testimony of Trauger. According to Trauger, he and Allen were playing checkers when the latter said, "Oh, look." Trauger turned and saw Deal coming towards them; De La Roi was close behind. De La Roi had a knife in his hand, and it appeared as though he was striking Deal, who fell near their feet.

Allen's account of the fatal stabbing is now quite different from that which he gave to the jury. In his affidavit he asserted: "I was in the laundry playing checkers with Robert M. Trauger, also known as Dutch. When William Deal was stabbed I did not see it. Steve Nowakowski called me into his office. At first I told him I did not see it. Then he let me go. The second time I went up there he told me he was going to charge me with a subpoena. So I said, 'All right I will testify against De La Roi.' Then he showed the maps and how it happened. He told me to tell the Court the story of the fight that he had given me. He told me how De La Roi was supposed to have gone through the door and how he was supposed to have held the knife. He says after the court we will protect you all we can and we will give you a break. The first time I saw William Deal was when he was being carried out. After this I talked to Dutch. He told me he knew nothing about it any more than I did but that he had talked to Nowakowski and was going to go along and tell any story that Nowakowski wanted. The map that Nowakowski showed me was a large one like they had in court."

At the referee's hearing, Allen declared that he was in the laundry playing checkers with Trauger at the time of the killing, that the assault took place about 10 to 15 feet in front of him, and that Deal fell at a point about four feet from the table at which he was playing checkers, but he denied hearing any unusual noise. He also said that he did not see De La Roi in the laundry. He explained that, "when a man is playing checkers he will watch his game," and he did not hear any noise because "it was all done quietly." He did not see Deal until some inmates turned him over.

Allen was then confronted with several statements made to the prison authorities which were in accordance with his testimony at the trial. He admitted making the statements, but told the referee that Nowakowski, by means of threats and promises, had induced him to falsely accuse De La Roi of the crime.

Admittedly, after Deal was stabbed, Allen, Robinson and Trauger were removed from the cell block and given quarters at the sewer plant on the penitentiary grounds where they received special privileges (*People* v. *De La Roi, supra,* at p. 696). After he was living at the sewer plant, Allen told the referee, Nowakowski questioned him about the crime. When he said he knew nothing, Allen declared, Nowakowski threatened to subpoena him and offered him a "break" if he would testify against De La Roi. Not knowing what Nowakowski meant by "subpoena," he was put in fear because he "thought maybe it was the same thing as being locked up forever." Accordingly, Allen testified, he agreed to be a witness against De La Roi, and testify in the manner suggested by Nowakowski. Also, Allen told the referee, since the trial neither De La Roi nor his brother, nor any of their friends, has threatened him in any way. He said he recanted his testimony because of the treatment of the prison officials after the trial: "they threw me in the tower like a pig. They gave me plenty of hell down there . . . in that hole. . . . That is why I am doing it. When they promise you anything, they should keep their promise."

On cross-examination Allen admitted that since giving his testimony he has had bad treatment from both the inmates and the officers. He has been in fear, he said; "anybody would be." He admitted that after the referee was appointed, at an interview in the office of the Captain of the Guard at San Quentin Prison, when asked, "[the inmates have]

made it kind of tough on you since you have testified, haven't they?" he replied affirmatively and added: "I don't want to go through anything like that again." His life in prison since he testified for the State has been worse than unpleasant, he said; "it has been hell."

It appears that this interrogation was occasioned by his affidavit which is attached to the De La Roi petition. He made the affidavit recanting his prior testimony, he told authorities at the San Quentin interview, because of a desire to avoid harm which might come to him as a result of his testimony.

Robinson testified at the trial of De La Roi that just before the killing of Deal he was standing at a drinking fountain two to three feet from the east wall of the laundry building. The fountain was close to "pretty good sized windows," covered with wire screen having a mesh of three-quarters or one inch. He saw De La Roi and one Eddie Walker, whom he had heard talking in loud voices with some other inmates a short time before, enter the laundry. Suddenly he heard a scuffling of feet and looking through the window, he saw De La Roi with a knife in his hand, stabbing "at this other fellow." Robinson left and went to the baseball diamond. In a few minutes De La Roi came out of the laundry with a bundle in his hand, which he dropped into a barrel located about eight feet from where the witness was then sitting. Eddie Walker met De La Roi there and they seemed excited. Robinson also testified that his treatment had been no different from the time of the killing than before; that he occupied the same quarters in Number One Building.

In his affidavit which is attached to the petition for a writ of habeas corpus Robinson said, "I stopped by the laundry to get a drink of water. After I got my drink I saw some men running out of the laundry. Immediately I judged there was some trouble, but at that time I did not know exactly what the trouble was, but I was told there was a stabbing and I wanted to get out of the way, so I left the fountain and returned to the chapel. I watched from the chapel and saw a man being carried out of the laundry. For the first time I realized that a murder had been committed while I was at the drinking fountain . . . as a matter of fact no one could see into the laundry through these windows when the sun shines on them, even when the sun is not shining on them it was hard to see through be-

cause there were two screens in front of the glass. At this particular time of the day the sun was shining on them, which made it that much harder to see inside the laundry.''

Robinson alleged in his affidavit that he continued to deny that he had witnessed the killing despite Nowakowski's threat that if he ''didn't come clean'' he ''would be forced to testify anyway.'' He was taken to the sewage plant and given quarters there. Five days later, Nowakowski came to the plant and said that ''he would fix that up and instruct me and what I said would be coached by him.'' According to the affidavit Robinson related in detail how Nowakowski told him to testify. The reason why he perjured himself, said Robinson, is that Nowakowski ''promised he would help out in getting a year good time'' and that Nowakowski used ''some word, I think it was 'subpoena' . . . and this scared me. . . .'' Robinson, in conclusion, declared that he did not witness the homicide and that he could not have seen it from the position where he was standing.

In an interview at San Quentin Prison before the referee's hearing, Robinson gave a different reason for the change in his testimony. Nowakowski did not use the word ''subpoena,'' said Robinson, but informed him that if he would not testify to what he had seen while standing at the drinking fountain, ''they would put a perjury and force me in the court''; that he testified to seeing De La Roi stab Deal for the additional reason that he was promised ''some kind of credits or something.'' Yet Robinson admitted that nothing had ever been done for him because of his testimony; he had been granted a parole prior to the killing and he was a ''short timer.''

After he testified against De La Roi, Robinson told the officials who were interrogating him, prison life was quite different from before. Some of the inmates would say of him, ''There goes the man that put the finger on the man in the death row.'' That made him feel quite concerned and upset. Also, he said, he ''had a little fear, like going in a show or something like that, maybe I thought they would try to bring some harm to me, or something like that. . . . When the man is still on Death Row, why shouldn't I have fear?''

As to the occurrences at the time Deal was stabbed, Robinson asserted that he was standing at the fountain ''when it happened'': that he heard scuffling and looked towards the

window, but could not see anything because the sun was shining on the glass; he said one could not see into the laundry from the position he occupied when the sun was shining on the window. He stated that after he heard the scuffling some men ran out of the building, and "when they ran past me I went with them."

Robinson's testimony before the referee is that he went from the chapel to the fountain. "When I got a drink I heard some scuffling, and naturally I looked up right away, and I noticed that there was either some trouble, or something, that occurred, so I left, and got out of the way, and went on back to the chapel." He denied seeing anyone stab Deal. On cross-examination, he testified that the windows of the laundry face east, and that as the sun was shining on the window glass, he could not see into the building. He gave false testimony at the trial, he said, because he was told that if he didn't appear in court, they would serve a subpoena and force him to go to court, and he thought it might affect him." Also, he declared, he was "promised some good time" in case he "would go and take the witness stand." On cross-examination he explained that he used the word "perjury" in his interview at San Quentin because he could not remember the word "subpoena."

He has changed his testimony, he told the referee, in order to clear his troubled conscience. It appears that after the trial of De La Roi he was released from prison but is now an inmate of San Quentin because of a violation of the conditions of his parole. He explained that upon his return to prison, he told Johnny De La Roi, the petitioner's brother, and an inmate of San Quentin, that he had testified falsely at the trial, and asked if he could do anything "to clarify" himself. He denied being afraid of Johnny De La Roi, or that the latter had threatened him after they met at San Quentin. He explained: "all the time that I was here, I didn't feel right. I couldn't sleep and I had a little fear in several ways, and I had a fellow go up and talk to Johnny first—that is, to see would he permit me to come up and talk to him." This was not fear of Johnny De La Roi but "fear generally," said Robinson. "I figured I didn't feel right and just about the statements I had made, and I figured some day I would be out and probably I would meet with friends, and sooner or later, it would hurt me. . . . I have lost quite a considerable number of friends so far

by going to court.'' But the witness maintained that he had no fear of anyone in particular; he changed his story because he wanted to clear his conscience.

On redirect examination Robinson was more specific. He said: ''... I got up in court and made an untrue statement, and I knew that, sooner or later, I would meet either his brothers or some of his friends—I make friends with mostly anyone, —Yes; I had fear in certain ways,—in a lot of ways—that I may meet him on the street—I may meet him in shows, or anywhere. I may meet some of his friends outside. It is hard to explain just where I might meet a person. And then, again, harm could come to some of my people as revenge, or something like that, and I wanted to come back and clarify myself, so as to take the blame as my own. If there was anyone to be blamed or to be hurt in any way, I would rather take it on my own than to have any of my people, or anyone else, harmed in any way in that matter; and I also thought of the boy that was on the death row—that by him being on the death row, and had he died in the gas chamber, I would be guilty of it,—of such statements that I made in court.''

William J. Ryan, Captain of the Guard at Folsom Prison at the time of the killing, testified at the referee's hearing that the windows of the laundry are covered by a one-half inch mesh screen. As was the custom during the summer months, on the day Deal was stabbed those windows were open. It was possible to stand outside the windows and look into the laundry; he had done so ''quite often.'' In any event, said he, at the time of day the homicide occurred, the sun could not cast a reflection on the windows.

As a witness in his own behalf before the referee, De La Roi described the procedure followed by the inmates in making coffee. He said that they used a boiler which was about a foot from the window near the fountain. The ''fellows outside would close those windows to keep from getting the steam on them,'' and ''they would leave them closed that afternoon.''

Directly contradicting the affidavits and testimony of Allen and Robinson, Nowakowski told the referee that he did not make any promises to either of them in connection with their testimony at the trial of De La Roi; that he did not tell them how or what to testify to, nor threaten them in

any way. Refreshing his memory from his records, Nowakowski declared that the first time he ever spoke to Robinson was when the convict was being interviewed by prison officials, a number of whom were present. That was more than three months after the homicide and after Robinson had given the warden a signed statement in which De La Roi was charged with the crime. Through a window in the laundry, Robinson related in this statement, he "saw De La Roi swinging at Deal with a knife."

Continuing his testimony, Nowakowski said that following the interview he may have talked to Robinson at the sewer plant, but at no time did they have any private conversation. Although he "did go to the sewer plant occasionally and talk to Allen and Trauger and Knapp, and the boys down there," he never saw "a map of the laundry prior to the time of the trial." He had nothing to do with placing inmates at the sewer plant, and he went there only for the purpose of ascertaining whether the prisoners were getting proper food.

The referee, after considering all of the evidence presented to him, found that the testimony of Robinson at the trial of De La Roi was logical, convincing and consistent; it was corroborated by that of Sam Kellum, Earl McAllister, and Anthony Roundtree, none of whom is charged with perjury, and it was not induced by anyone. On the contrary, the testimony given at the referee's hearing is false, and it is uncorroborated by and inconsistent with the testimony given by other witnesses. Moreover, the statements now made by Robinson as to window glare obstructing his view of the laundry is false and opposed to meteorological law.

Considering the various accounts of the homicide given by Allen, the referee found that his testimony before the jury "was not perjured . . . but was truthful, logical, corroborated by and consistent with [that] . . . of other witnesses [and] was corroborated in almost every detail by witness Robert M. Trauger . . . [whose testimony] is not in any way attacked as false or perjured." Also, the referee found, the testimony of Allen was corroborated in minor detail by the witnesses Kellum, McAllister and Roundtree. It is inconceivable that Allen, playing checkers within ten feet of the point where Deal was stabbed, heard nothing and saw nothing in connection with the assault although Deal

fell to the floor and died almost within arm's reach of the table where the game was going on.

The findings upon other evidence are to the effect that the statements of Nowakowski at the trial and before the referee are consistent with and point to the truth of the testimony of both Robinson and Allen before the jury. Likewise the testimony of Ryan "points unerringly and clearly to the conclusion that the testimony given by witnesses Robinson and Allen at the original trial . . . was the truth, and that testimony of each of those witnesses was logical and consistent with the acts and facts testified to by other witnesses."

Turning to the issue as to the motive actuating Robinson and Allen to change their testimony, the referee declared that they abandoned the accounts of the homicide given at the trial and testified falsely before him because of their fear of vindictive friends of the petitioner. Neither Robinson nor Allen was threatened nor was any promise or any inducement made to either of them for testifying at the trial. Neither one was instructed or coached by Nowakowski or by any other person; each gave his testimony freely and voluntarily. Neither of them believed that a "subpoena" was an instrument of torture or weapon; nor was he misled by the use of that word.

In a general summation of these findings the referee concluded "that no witness who testified against Wilson De La Roi at the trial which resulted in the judgment of conviction . . . committed perjury as defined in the Penal Code of the State of California; and that no witness testified to any material matter which he knew to be false . . . there being no perjury committed at the time of the trial, no representative of the State of California caused or suffered any testimony to be introduced knowing that such testimony as given was perjured."

To these findings, counsel for De La Roi filed exceptions which challenge the determination that the testimony of other witnesses at the trial corroborates the testimony given by Allen and Robinson before the jury and point to certain discrepancies in the various accounts of the crime. It is also said that some of the findings are not supported by the evidence, and the petitioner particularly criticizes the referee's determination that Allen and Robinson have changed

their testimony because of the fear of vengeance at the hands of De La Roi's friends.

■ Although this court is not bound by the findings of fact made by a referee (see, *In re Mooney,* 10 Cal.2d 1, 17 [73 P.2d 554]), his conclusions are entitled to more consideration than the bare testimony of the witnesses. He had an opportunity to observe the demeanor of those who appeared before him and to weigh what they said in connection with their manner on the witness stand. In the present case, the evidence not only fully justifies the findings adverse to the petitioner but compels them. One cannot read the transcript of the interviews of Allen and Robinson at San Quentin Prison shortly after the commencement of this proceeding and their testimony before the referee without reaching the conclusion that each of them is now motivated by great fear of vengeance on the part of fellow convicts or others. Moreover, the accounts they now give as to the occurrences at the time Deal was stabbed are, to say the least, unconvincing. Allen stated to the referee, as he did at the trial, that he was facing the parties and within a few feet of the place where the assault occurred. But he did not see the stabbing, according to his latest account of the homicide, because it was "quietly done." Robinson still places himself outside of the laundry and near the windows which are not far from the point at which Deal was killed but he denies his statement to the jury that he saw De La Roi strike Deal with a knife.

Of particular significance in measuring the testimony of Allen as given at the trial and before the referee is a statement which he made to the prison officials shortly after the stabbing and before he was removed to the sewer plant. He then stated that De La Roi killed Deal and he described the occurrences in connection with the homicide just as he related them when he was a witness for the State. Allen now claims that Nowakowski, at interviews which took place at the sewer plant, induced him to falsely charge De La Roi with the crime, but his first statement concerning the crime cannot be reconciled with his present account of what transpired and it is also consistent with Robinson's testimony at the trial.

Although there are certain inconsistencies in the testimony of the witnesses who, the referee found corroborated the accounts of the crime given by Allen and Robinson before

the jury, the verdict impliedly determined that Deal was stabbed by De La Roi while the two men were in the laundry. The differences in the various versions of the stabbing concern minor details and do not have any bearing upon the issue presented by the testimony of De La Roi and the witnesses who testified on his behalf. The evidence relied upon by De La Roi in support of his plea of innocence is to the effect that he was not in the laundry when Deal was stabbed but near the handball court on the prison grounds. Under these circumstances, the record clearly shows that the petitioner has not established by that preponderance of substantial, credible evidence which the law requires, the charges upon which the writ of habeas corpus issued. (*In re Mooney, supra*, at p. 15.)

Evidence received in behalf of the petitioner at the hearings held by the referee for the purpose of allowing the presentation of additional evidence does not change these conclusions. After the findings were filed, the petitioner was granted leave to offer the testimony of certain prison inmates. One of them, Harold La Combe, told the referee that, after the petitioner was convicted, he became acquainted with Allen and Johnny De La Roi. They worked under him in caring for the warden's garden and "seemed to be very friendly." In answer to the question, "Did James Allen ever express to you the thought that he was in fear of either John De La Roi or friends of John De La Roi or Wilson De La Roi?," the witness replied, "No." Over the objection of the attorney general, La Combe testified that Allen told him "he was sorry that he had went down on the trial; that he perjured himself and that he didn't fear anything as he was a friend of Johnny De La Roi." La Combe also declared that on the day of the stabbing, immediately after lunch, he was running the domino game in number one building. McAllister, Bernard Thomas, Moore, and a convict called "Dutch" were playing. According to La Combe, from where they were playing it was impossible to see the door of the laundry.

Ernest Wilson told the referee that he was in the laundry at the time of the stabbing. About five minutes after it happened Trauger came into the room and said, "it was a dirty trick and that if he knew who did it he would bust him over the head with a chair." When asked if Trauger testi-

fied truthfully about playing checkers in the laundry with Allen, Wilson said, "I would say it was untrue." As Wilson related the circumstances in connection with the crime, immediately prior to the killing of De La Roi, Eddie Walker and a third man came into the laundry. The three walked over to Deal and either De La Roi or Walker stabbed Deal. However, Wilson admitted that shortly after the crime, in the office of the warden, he stated that he saw De La Roi stab Deal.

Another witness was Bernard Thomas, who told the referee that on the day of the crime he started playing dominos about 12:30 p. m. McAllister and Moore were also playing; La Combe was running the game. But in answer to the question as to whether he knew McAllister was present at the domino game from shortly after lunch until all went to the Captain's lineup, he replied, "I wouldn't swear to it; I wouldn't say I was positive."

Deal was murdered by Eddie Walker, according to Frank O'Neal, who told the referee that he saw De La Roi and Walker come out of the building. Norman Austin also charged Walker with crime. Austin testified that he was inside the laundry talking with Deal when the stabbing occurred. Walker and De La Roi came in, and "Walker stabbed Bill Deal in the back and he screamed, and when he came around he stuck him in the chest or front with a knife, and Bill Deal started to run." When asked if Allen was in the laundry at that time, the witness replied, "I didn't see him if he was." Austin does not remember seeing Trauger in the laundry. But he admitted having made a statement shortly before the referee's hearing to the effect that on the day Deal was killed he was down at the back gate and that neither De La Roi nor Eddie Walker were at the laundry.

A former cell mate of Trauger said that he had just finished playing handball and was standing against the screen running from the old morgue back to the wall when he heard Deal scream. This witness, James Morgan, said that he was resting after playing with the petitioner and his brother. Trauger was "sitting back against the rock wall" in the laundry yard playing checkers; petitioner "was standing in the handball court."

The last witness to testify before the referee was Homer W. Haslam. He said that on the day of the homicide his job was to try to keep out of the laundry building the "fel-

lows who didn't belong'' there. He left his post to get a drink of water and upon his return he heard a ''holler.'' He did not see anyone chasing Deal, nor did he see anyone playing checkers in the immediate area. He did not know the petitioner and he did. not see either Eddie Walker, Allen or Trauger there, but both Trauger and Allen worked in the laundry.

Upon the supplemental evidence the referee found that nothing had been presented to change the determination stated in his first report to the court, and he concluded: ''The credibility of the testimony of both Trauger and Allen when they testified at the trial remains unimpeached; . . . they were playing checkers at the laundry at the time of the assault and . . . the testimony given at the trial was logical, consistent and reasonable.''

Although at the trial of De La Roi there was a direct conflict between the evidence offered by the State and that relied upon in defense of the charge, the testimony now being considered does not present the same difficulties. The accounts of the homicide related to the jury by Allen and Robinson agree with their statements made to prison authorities soon after the crime was committed and, except for minor and immaterial inconsistencies were corroborated by other witnesses. As against the claim that both Allen and Robinson were induced by Nowakowski falsely to accuse De La Roi of the stabbing stands the testimony of Nowakowski, which is substantiated by some documentary proof to the contrary. But the determination of the referee that the facts which Allen and Robinson stated to the jury are true finds convincing support in the accounts given by them as to their life in prison since the trial and the very frank statement which each of them made in regard to his fear of harm which may come to him because of his testimony as a witness for the State. Their fear is quite understandable, and unquestionably it is the motivating factor in the present proceeding.

The writ is discharged and Wilson De La Roi is remanded to custody.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.