[Crim. No. 5731. In Bank. Sept. 28, 1956.]

In re JOHN ALLEN and LOUIS F. SMITH, on Habeas Corpus.

Valentine C. Hammack, under appointment by the Supreme Court, and Sidney Feinberg, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, Arlo E. Smith and William M. Bennett, Deputy Attorneys General, for Respondent.

GIBSON, C. J.—In 1950, petitioners Louis F. Smith and John Allen, inmates of Folsom prison, were convicted of murdering a fellow prisoner named Borton and of violating Penal Code section 4500, which makes it a crime for a person serving a life sentence to assault another with a deadly weapon. They were sentenced to death for each offense, and the judgments of conviction and orders denying a new trial were affirmed by this court. (*People* v. *Smith,* 36 Cal.2d 444 [224 P.2d 719].) Petitioners seek a writ of habeas corpus on the theory that they were denied due process of law.

The petition charges that a prisoner named Biersdorff testified falsely in response to promises of release made by Warden Heinze of Folsom prison, that he was coached in his false testimony by a deputy district attorney, that as a result of deliberate fraud, or because of the persuasive influence, amounting to duress, of these officials, Biersdorff testified falsely at the trial in identifying petitioners, and that the jury, the court and defense attorneys were thereby misled into believing that petitioners had committed the assault. The petition also alleges that, because of false information given by Biersdorff, the state officials did not make a full investigation and failed to discover the actual perpetrators of the assault, convicts Patterson and Mullen, who confessed to the crime after petitioners had been convicted.

An order to show cause was issued, and Honorable John P. McMurray, judge of the Superior Court of Inyo County, was appointed referee to hear evidence relating to petitioners' charges.* Hearings were held at which several witnesses, including petitioners, appeared and testified. Among the

---

*The questions submitted to the referee were:

1. Did any witness who testified against Louis Franklin Smith and John Allen in the trial which led to their conviction on the charges for which they were sentenced to death, commit perjury under sections 118 and 125 of the Penal Code of the State of California, that is, did any such witness willfully state as true any material matter which he knew to be false, or willfully make an unqualified statement of any material matter which he did not know to be true?

2. In the event that such witness or witnesses did commit perjury, did the representatives of the State of California, the district attorney,

documents received in evidence were an affidavit by Biersdorff, the witness who assertedly committed perjury, and confessions by convicts Mullen and Patterson. It was stipulated that the referee might consider the transcripts and exhibits from the prior trial. On the basis of this record the referee made findings of fact to the effect that no witness who testified at the trial committed perjury, that, there being no perjury committed, no representative of the state suffered any testimony to be introduced knowing it was perjured and that no representative suppressed any evidence which would have been favorable to petitioners' defense.† Petitioners have excepted to these findings.

■ While not binding on this court, the findings of fact made by the referee are entitled to great weight since he had an opportunity to observe the demeanor of the witnesses when they testified. (*In re De La Roi,* 27 Cal.2d 354, 364 [164 P.2d 10]; *In re Mitchell,* 35 Cal.2d 849, 855 [221 P.2d 689].) After a review of the record, we have concluded that the referee's decision is correct and that the evidence fully supports his findings.

A recital of some of the evidence in support of the judgment of conviction will make it easier to understand the evidence before the referee and to pass upon petitioners' contentions. The only eyewitness presented by the People at the trial was Biersdorff, who testified that, on the morning of October 11, 1949, he heard someone shout, "Help, they're killing me," and, looking in a window of the prison barbershop, he saw petitioners attacking Borton. He said that Allen hit Borton on the head several times with a hatchet, knocking him down, and that, while Allen was striking Borton with a hatchet, Smith

---

or any of his deputies or assistants, cause or suffer such testimony to be introduced knowing that such testimony as given was perjured?

3. Did the representatives of the State of California, the district attorney, or any of his deputies or assistants, deliberately, willfully, knowingly, or at all, suppress or prevent the introduction of any evidence which, had it been given, would have been favorable to the defense of said Louis Franklin Smith and John Allen?

†The referee made the following general findings of fact:

"(1) No witness who testified against Louis Franklin Smith and John Allen in the trial which led to their conviction on the charges for which they were sentenced to death committed perjury . . . (2) That there being no perjury committed at the time of the trial, no representative of the State of California caused or suffered any testimony to be introduced, knowing that such testimony as given was perjured. (3) No representative of the State of California, the district attorney or any of his deputies . . . suppressed or prevented the introduction of any evidence which, had it been given, would have been favorable to the defense of said Louis Franklin Smith and John Allen."

was stabbing him with a knife. Biersdorff backed away from the window and saw petitioners leave the barbershop and go to an area at the rear of the shop where there were facilities for washing. Borton then staggered out of the building with a knife in his back.

Prison officers testified at the trial that they examined petitioners shortly after the crime and found that Smith had blood spots on his arm and Allen had a fresh cut on his hand. They had blood on their clothing of group A, which was Borton's blood type. A hatchet with blood on it was found in the barbershop, and a search revealed that a leg was missing from a low table in Smith's cell. A criminologist testified that in his opinion the hatchet handle was made from the missing leg, basing his conclusion on similarities between the handle and the remaining table legs as to length, paint layering and arrangement of mortices. The hatchet handle and the handle of the knife found in Borton's back were wrapped with the same kind of paper-backed Scotch masking tape and the torn ends matched, that is, the outside end of the tape applied to the hatchet handle matched the inside end of the tape applied to the knife. There was also other evidence tending to connect petitioners with the crime.

Biersdorff's affidavit, which was executed after petitioners were convicted, was set forth as newly discovered evidence in connection with their motions for a new trial. He stated therein, ''I want my testimony thrown out of Court. I was made a lot of promises that were never kept. . . . When Mr. McDonald* [sic] came to the prison to question me, I was shown all of the pictures that were taken after William Barton [sic] was killed. At that time suggestions were made to me, concerning these pictures. Things that if I hadn't been shown I wouldn't of testified to in Court. . . . I did not want to testify because I told Mr. Heinze that I wasn't sure about the two men that I saw in the barber shop. He told me, 'them are the men including Fitzgerald.' Without the coaching I could not have positively identified Allen and Smith.''

In our opinion in *People* v. *Smith,* 36 Cal.2d at page 449, we pointed out that Biersdorff did not state that on retrial he would retract any of his testimony, or that he did in fact testify falsely, or that any officer suggested to him that he tell anything about the case that was not the truth.

---

*The reference is to Deputy District Attorney McDonell who tried the case.

At the referee's hearing, Biersdorff denied the truth of the material parts of the affidavit, repeated substantially the same testimony he gave at the trial and insisted that at no place in his affidavit did he state that his testimony had been untrue. He claimed that before, during and after the trial he was subjected to threats and physical abuse by his fellow prisoners and that he made the affidavit because he was in fear of his life.

Deputy District Attorney McDonell testified that after the trial Biersdorff complained that he was being intimidated and that he, McDonell, became concerned as to whether Biersdorff had told the truth about what had occurred at the time of the killing. McDonell said that he questioned Biersdorff at length but never discovered anything which appeared "to be a lie, as far as his testimony was concerned." At McDonell's request, Dr. Toler, a psychiatrist, examined Biersdorff for about three hours and Dr. Toler concluded that the "probabilities are that he is telling the truth." Before argument on the motion for a new trial, McDonell advised the district attorney, the defense attorneys and the trial judge of his concern as to whether Biersdorff had told the truth at the trial. As a result, the district attorney interviewed Biersdorff, stating that he was going to argue the motion for a new trial, that he wanted to be sure that Biersdorff's testimony was true and that, if there was any question as to its truth, he would so inform the court. He told Biersdorff that all he wanted was the truth and that he would not prosecute him for perjury. Biersdorff replied that he had told the absolute truth at the trial.

The apprehensions of McDonell, of course, did not establish the existence of perjury, and after a review of the record we are convinced, as was the referee, that, while Biersdorff was somewhat unstable, there was a lack of substantial, credible evidence of perjury. But even if we were to assume, as petitioners contend, that Biersdorff did testify falsely, there has been a failure to prove sufficient facts to warrant relief in a habeas corpus proceeding. Petitioners have the burden of showing, not only that they were convicted by perjured testimony, but also that the prosecuting officials suffered the testimony to be introduced knowing that it was perjured. (*In re Mitchell*, 35 Cal.2d 849, 856 [221 P.2d 689]; *In re Lindley*, 29 Cal.2d 709, 722 [177 P.2d 918]; *In re De La Roi*, 28 Cal.2d 264, 269 [169 P.2d 363]; *In re Mooney*, 10 Cal.2d 1, 15 [73 P.2d 554].) Here there is a

complete lack of evidence that the prosecuting officials knew that the testimony was false. Their conduct, instead of indicating collusion on their part, clearly shows that they made every effort to determine if there was perjured testimony and were unable to find any.

 The statements of Mullen and Patterson, in their affidavits which were made about eleven months after the murder and more than six months after the trial, may be summarized as follows: On the morning of October 11, 1949, in response to a request by Borton, they went to the barbershop where they had an argument with Borton over $180. Borton threw a tool box at them and then pulled a hatchet from under a counter. Patterson "got the hatchet some way" and started whacking at Borton, and Mullen then stabbed Borton with a knife. In the midst of the attack, Smith and Allen entered the barbershop and got blood on their clothes while trying to separate the combatants. At no time did Smith or Allen strike a blow. After the fight, Patterson and Mullen went to the chaplain's office where they changed to clean clothes.

At the referee's hearing both Mullen and Patterson testified that their confessions were in all respects truthful, but their testimony does not warrant belief in the light of their prior statements and other evidence.

The "confessions" of Mullen and Patterson are in direct conflict with statements they made when they were questioned by prison authorities on the day of the murder. At that time they both claimed to have been about 100 feet from the barbershop talking to fellow inmates when the killing took place.

When Patterson was interviewed by an investigator for the attorney general's office some months after his confession he said the knife was about 15 inches long with a curve on the end of it "like a butter knife" and that it was made by cutting a piece of metal from the blade of a shovel. Mullen testified that the knife had a long slender curved blade which was sharpened on one side. As a matter of fact, the knife was made of metal far thicker than a shovel and it did not turn up at the end but was a straight bayonet-shaped knife. Patterson testified at the hearing that he had been told the location of the knife and had relayed this information to Mullen, who dug the knife out of the middle of the yard at Folsom. Mullen told an investigator that he had had the knife for quite a while and in his statement to the associate warden at the time he made his confession he said he did not remember

how he got it, but he testified at the hearing that he received the knife from another convict when he entered the barbershop and that he had not seen it before. When confronted with the statement he had made to the investigator he said, "Well I probably had the knife the night before."

There was also inconsistency with reference to the hatchet used to strike Borton. Patterson stated in his confession that he took the hatchet from Borton who got it from under a counter in the barbershop. When interviewed by an investigator Patterson stated that he had made the handle from a leg of a table in Smith's cell and that he had the hatchet with him when he went into the barbershop. Later he told the investigator that he got the hatchet after he entered the shop, and at the referee's hearing he testified that he was unable to describe the hatchet because he had only had it in his possession for a few minutes.

The statements of Patterson and Mullen in their confessions, repeated in their testimony at the hearing, that petitioners tried to break up the fight in the barbershop, are contrary to the testimony given by petitioners at the trial, not since repudiated, that they were in another part of the prison yard when the murder was committed and that they did not arrive at the scene until a crowd had gathered around Borton. If, as Mullen and Patterson testified, petitioners did not commit the crime but tried to break up the fight in the barbershop, they would have seen Mullen and Patterson committing the crime and they could and should have brought this out at their trial.

The referee was amply justified in finding that the confessions and testimony of Mullen and Patterson were not entitled to belief and that no evidence was suppressed by the authorities.

The order to show cause is discharged, and the petition is denied.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.