[Crim. No. 7045. In Bank. June 12, 1962.]

In re GEORGE EDWARD RIDDLE on Habeas Corpus.

E. M. Mannon, under appointment by the Supreme Court, for Petitioner.

Stanley Mosk, Attorney General, John S. McInerny and Albert W. Harris, Jr., Deputy Attorneys General, for Respondent.

PETERS, J.—George Edward Riddle, an inmate of San Quentin Prison, has filed, in propria persona, a petition for habeas corpus in which he seeks his release because of the alleged cruelty of the prison custodial officers. He alleges that his head was split open as the result of an unprovoked clubbing by the prison guards. He also alleges that he has been kept isolated from other prisoners so that they could not

learn of the extent of his injuries. These allegations were denied by respondent. As a result of these conflicts, and based on the allegations of the petition, an order to show cause was issued, counsel appointed for petitioner, and the Honorable J. T. B. Warne was appointed as referee to make the necessary factual determinations.

 The allegations of the petition stated a good cause for relief by habeas corpus. The California courts have used the writ not only to test jurisdiction, but also to protect the fundamental basic rights of prisoners. Thus the writ has been used to examine allegations by prisoners that they were beaten (*In re Cathey,* 55 Cal.2d 679, 694 [12 Cal.Rptr. 762, 361 P.2d 426]), or denied religious freedom (*In re Ferguson,* 55 Cal.2d 663 [12 Cal.Rptr. 753, 361 P.2d 417]), or prevented from effectively communicating with counsel (*In re Ferguson, supra,* at p. 677; *In re Qualls,* 58 Cal.App.2d 330 [136 P.2d 341]; *In re Snyder,* 62 Cal.App. 697 [217 P. 777]; *In re Rider,* 50 Cal.App. 797 [195 P. 965]), or the courts (*In re Ferguson, supra,* at p. 676; *In re Cathey, supra,* at pp. 695-696; *In re Chessman,* 44 Cal.2d 1, 9 [279 P.2d 24]; *In re Robinson,* 112 Cal.App.2d 626, 629 [246 P.2d 982]; *In re Malone,* 112 Cal.App.2d 631 [246 P.2d 984]).

 If it were a fact that cruel, inhuman, or excessive punishment had been inflicted on petitioner it would have been an invasion of his fundamental constitutional rights, entitled to protection under both the federal and state Constitutions. The federal Constitution and the state Constitution prohibit the imposition of "cruel and inhuman" punishments.[1]

In recognition of these constitutional rights, the Penal Code of California carefully restricts the prison authorities in the treatment of prisoners. Section 2650 provides: "The person of a prisoner sentenced to imprisonment in the State prison is

---

[1]While the Eighth Amendment so providing is directed to the federal government and not to the states (*Collins* v. *Johnston,* 237 U.S. 502, 510 [35 S.Ct. 649, 59 L.Ed. 1071]; *Pervear* v. *The Commonwealth,* 72 U.S. (5 Wall.) 475, 479-480 [18 L.Ed. 608]; *People* v. *Cruz,* 113 Cal.App. 519, 520 [298 P. 556]), there is respectable authority holding that to inflict cruel or inhuman punishment upon a prisoner is a violation of his due process rights under the Fourteenth Amendment. (*Sweeney* v. *Woodall,* 344 U.S. 86, 93 [73 S.Ct. 139, 97 L.Ed. 114] (dissent); *Francis* v. *Resweber,* 329 U.S. 459, 463, 472-481 [67 S.Ct. 374, 91 L.Ed. 422]; *Johnson* v. *Dye,* 175 F.2d 250, *revd. per curiam on procedural grounds,* 338 U.S. 864 [70 S.Ct. 146, 94 L.Ed. 530]; *Application of Middlebrooks,* 88 F.Supp. 943, 951-952, *revd. on procedural grounds; Ross* v. *Middlebrooks,* 188 F.2d 308; *Harper* v. *Wall,* 85 F.Supp. 783; *Siegel* v. *Ragen,* 88 F.Supp. 996, 999, *affd.* 180 F.2d 785; *Johnson* v. *Matthews,* 182 F.2d 677, 684 (dissent).)

under the protection of the law, and any injury to his person, not authorized by law, is punishable in the same manner as if he were not convicted or sentenced.'' The next section (2651) provides that: ''No punishment, except as may be authorized by the Director of Corrections, shall be inflicted and then only by the order and under the direction of the wardens. . . .'' Sections 147 and 2653 both provide that one who is guilty of ''willful inhumanity or oppression'' toward a prisoner is subject to a fine or removal from office. Sections 673 and 2652 make it a misdemeanor to use any ''cruel, corporal or unusual punishment'' upon a prisoner. Section 149 provides that: ''Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding five thousand dollars, or by imprisonment in the state prison not exceeding five years or in a county jail not exceeding one year, or by both such fine and imprisonment.''

 Of course, custodial officers may use reasonable force upon a prisoner to enforce proper prison regulations or ''where necessary to prevent a prisoner from doing bodily harm to a prison official.'' (*In re Ferguson, supra,* 55 Cal.2d 663, 673.) The courts are and should be reluctant to interfere with or to hamper the discipline and control that must exist in a prison. Petitions containing such charges must be carefully scrutinized and the facts carefully weighed with the thought in mind that they are frequently filed by prisoners who are keen and ready, on the slightest pretext, or none at all, to harass and to annoy the prison officials and to weaken their power and control. These prisoners include many violent and unscrupulous men who are ever alert to set law and order at defiance within or without the prison walls. The burden of proof is, of course, on the petitioner for the writ (*In re Allen,* 47 Cal.2d 55, 59 [301 P.2d 577]; *In re Berry,* 43 Cal.2d 838, 846 [279 P.2d 18]). To be entitled to any relief he must allege and prove that cruel, inhuman, or excessive punishment was inflicted upon him in violation of his fundamental and basic rights.

 The petitioner did not sustain that burden. He alleges that custodial officers Stanley and Bukowatz, on April 29, 1961, without provocation brutally beat him and fractured his skull. The referee found that:

''1. . . . force was used against petitioner by prison correction officers Raymond W. Stanley and Bob Bukowatz on April 29, 1961 but that the facts and circumstances which

occasioned the use of force are not as alleged by petitioner. I find that petitioner's statement of the facts are untrue.

"2. . . . said force was used for the purpose of making petitioner comply with prison regulations and direct orders of said correction officers. I further find that on the occasion in question that petitioner assaulted officer Stanley by striking him with his fists and kicking him and that as a result of such conduct on the part of petitioner it was reasonably necessary for Officer Stanley to use force in self-defense.

"3. . . . said force used was necessary to compel compliance by petitioner with prison regulations in each instance but that the *amount* of force used by correction officer Stanley in striking petitioner on the head with a baton is questionable as being fully justifiable."

The referee then found that the petitioner was struck on the head "with a baton," which was a 20-inch by 1½-inch club weighing 1 pound 6½ ounces. He described the injury suffered in detail. The injury was a severe one—a badly fractured skull necessitating brain surgery. It was first feared that the prisoner would die, but he has made a good convalescence. As a result of the operation, petitioner has an area about 3 inches long and about as wide as a lead pencil that is devoid of skull and only covered by scalp. This area may fill up with bone.

On the issue of isolating the prisoner the referee found:

"7. . . . that the petitioner has not been kept isolated from the other inmates since his release from the prison hospital, except that in January of 1962 petitioner was charged with maliciously ripping a stool seat, and concealing a metal tablespoon in his cell for which he was brought before the institutional disciplinary committee and given days in isolation."

These findings are all supported by substantial evidence. But even though they are so supported they are not binding on this court. They are, however, entitled to great weight. (*In re Martinez*, 52 Cal.2d 808, 812 [345 P.2d 449]; *In re Allen, supra,* 47 Cal.2d 55, 57; *In re Mitchell,* 35 Cal.2d 849, 855 [221 P.2d 689]; *In re De La Roi,* 27 Cal.2d 354, 364 [164 P.2d 10]; *In re Mooney,* 10 Cal.2d 1, 17 [73 P.2d 554].)

In the present case an independent review of the record has been made. Such review not only justifies but impels the conclusion that the referee's findings are correct and that petitioner has not sustained the burden of proof imposed on him in such cases.

The petitioner testified that on April 29, 1961, he

attended the afternoon movie; that there were no seats and he stood up during a short film; that when the second short started he walked toward an empty seat; that Officer Stanley approached and told him to get out; that he was then escorted by Officers Stanley and Bukowatz to the yard office; that there were two trusty inmates and six officials in the outer office; that Stanley and Bukowatz took him through the office to a small locker room; that upon request he gave Stanley his I.D. card and was then asked for his privilege card; that as he reached for this card Stanley hit him with the club, first on the head, then on the knee; that the two officers then stripped him and beat him with their fists about the face and body. He was then taken to the hospital. Petitioner denied striking Stanley or Bukowatz or otherwise provoking the attack.

The corroboration produced by petitioner was very weak. Inmate Harmon, after being assured that he would not be penalized for telling the truth, testified that petitioner was behind him in line as he proceeded into the movie hall; that he did not know whether Riddle got into the hall but some others behind him were admitted. Inmate Bushon testified that he started toward the movies with Harmon and Riddle on the day in question; that Stanley stopped Riddle at the door; that others in the line were admitted; that he thought he saw Riddle hand Stanley his I.D. card. Other inmates saw Riddle being escorted across the yard by two officers, and testified that there was then no fighting.

A medical technical assistant testified that he was summoned to the yard office at about 3:30 p. m. on the day in question and saw Riddle with a head laceration that was bleeding; that Riddle told him he received the injury when ''he got into a beef with the bulls''; that he took Riddle to the hospital and summoned the medical officer; that the same day he examined Stanley and found that he had a swollen, reddened contusion of the chin, two loosened teeth, and abrasions on his left leg.

The operating physicians testified as to the nature of the injury, the medical and surgical steps taken, and one opined that the injury was serious enough so that Riddle was lucky to be alive.

The testimony produced by respondents was sharply conflicting in many respects. Stanley testified that on the day in question he was in charge of the motion-picture show; that after the feature picture had been run some of the inmates

left the movie hall and Riddle tried to enter; that Stanley told Riddle he could not come in; that from Riddle's attitude he feared that Riddle was going to hit him; that he and Bukowatz grabbed Riddle by the arms and escorted him to the yard office for a search, which was standard prison procedure; that they went into the back office and Stanley asked Riddle for his identification card; that Riddle then hit him in the mouth forcing the guard to his knees; that Bukowatz joined the melee and the three of them struggled on the floor; that Riddle kicked him on the leg; that Stanley (the guards were unarmed) got on his knees and reached back of him where he secured a baton or night stick kept there for such emergencies; that he hit Riddle across the kneecap with the baton; that Riddle did not stop fighting "so I hit him on the head, and he looked up at me and said, 'I have had enough' ''; that he then picked Riddle off the floor and took his clothes off, made a body search, which was negative, and then set Riddle in a chair.

The record shows that on April 29th or 30th Stanley gave notice to his superiors that he was going to quit his job, and after talking with an investigator from the Marin County District Attorney's office, he in fact did leave on May 6, 1961, and took a job in Nevada; that he returned to his job at San Quentin in August of 1961.

Bukowatz corroborated Stanley in all substantial respects, except that he testified that as Stanley, he and Riddle entered the yard office another officer, Birr by name, and two inmates were in that office. He particularly testified that Riddle hit Stanley as the latter was entering the locker room. The record shows that Bukowatz quit his job at San Quentin after this petition was filed, and that his superiors have recommended that if he should reapply for his job he should not again be hired as a custodial officer.

Another correctional officer, Stevenson by name, testified that he was called to the yard office after the fight; that Riddle was sitting on a chair with blood on his face; that when he asked Riddle what happened the latter responded that "he had hit this punk [indicating Stanley] on the chin and knocked him" down.

The two inmates who were in the yard office when Riddle and the two guards entered, testified that they heard Riddle use abusive language toward the guards. One of them testified that as Stanley entered the locker room after Riddle had entered, he saw Stanley's head snap back and heard a scuffle;

that he and his fellow inmate left the office pursuant to a standing order that this should be done whenever trouble occurred. The other inmate testified that he heard Stanley ask Riddle for his I.D. card, and then heard a scuffle and left.

In explanation of why Riddle has been kept in semi-isolation in the Adjustment Center, which is maintained for prisoners who are in need of close custodial care, L. S. Nelson, Associate Warden of Custody, testified at first that Riddle was placed in the Adjustment Center after his release from the hospital because of the yard office incident, and to protect Riddle from the other inmates, but later contradicted this testimony. He was quite clear, however, that Riddle had been kept in the Adjustment Center because of a long list of disciplinary offenses.

The supervisor of the Adjustment Center, Eugene Luttrell, testified that Riddle had been kept in the Adjustment Center because his actions demonstrated that he was not ready to be released to the general prison population. He described in detail a long series of offenses committed by Riddle since his assignment to the center, such as concealing contraband in his cell, fighting, ripping off a stool seat and refusing to lock up. This witness also testified that on October 31, 1961, a disciplinary report was filed against Riddle for filing false statements in a legal document in violation of a Department of Corrections rule; that he was found guilty on November 7, 1961, and was given a warning and reprimand; that although no other punishment was imposed, this will appear in Riddle's prison record. The legal document involved was Riddle's petition to this court filed on December 5, 1961. The statements in the proposed petition deemed by the authorities to be false were that many other prisoners have been beaten mercilessly by the guards, some into a state of total idiocy, and that petitioner has been prevented from informing his relatives of the assault and mayhem committed upon his person.

Before concluding this review of the evidence, it should be here stated that these charges should not have been made and punishment imposed at the times they were made and imposed. They appeared in a petition that was intended for this court's perusal, and in fact such petition was subsequently filed. ▄▄ Prisoners are entitled, as already pointed out, to free access to the courts. Prison officials are not justified in using coercion or force to prevent such access. ▄▄ Obviously, if, when a prisoner, as he must, submits his proposed petition to the prison officials for their perusal, and

the petition charges the officials with misconduct, the prison officials can summarily decide that his charges are false and punish him for making them, there is a form of coercion that will very effectively prevent access to the courts. One of the very issues presented by that petition was whether such charges were true or false. Certainly, there is nothing wrong with a prison regulation prohibiting the making of false charges, but the prisoner should be allowed full access to the courts, and where the charges are contained in a court document the officials should await the determination of the courts. For this reason it was improper to make these charges and impose punishment before this court had acted. The record of such charges and punishment now found in petitioner's file should be expunged from his record.

 Continuing with a summary of the evidence, the film schedule for April 29, 1961, indicates that the pictures then being shown were not those testified to by petitioner.

The warden had reported the incident here involved to the District Attorney of Marin County. One of the district attorney's investigators interrogated the participants early in May 1961. He said that Riddle described the events of April 29th much as he did at the referee's hearing, but that he also said that when Stanley asked him to leave the movie he did not want to leave, and made a move as if to hit one of the officers, whereupon Stanley and Bukowatz escorted him to the yard office. Riddle told the investigator that the two officers started to beat him after he had given them his I.D. card but had refused to deliver up his privilege card. The district attorney testified that he filed the warden's and the investigator's reports with the Grand Jury. That body decided to take no action.

This is a fair summary of the evidence. It is apparent that Riddle's story of what happened at the motion picture hall was contradicted by both the guards and by the film schedule. Riddle's two witnesses offered in corroboration of his story, substantiate him only on minor points. All the testimony, without conflict, shows that Riddle was escorted across the yard by the two guards to the yard office, and that there was no fighting en route. Once the parties are placed in the yard office, the stories are markedly contradictory, not only between petitioner and respondents but, to some extent, between respondents' own witnesses. Riddle testified that there were six officers and some inmates in the outer office when he entered. According to Stanley, and the two inmates, only the latter

two were in the office. Bukowatz places Officer Birr there with the two inmates.

Although the stories told by Bukowatz and Stanley as to how the fight started differ in some minor respects, they are in substantial accord that Riddle started the fight by hitting Stanley. Parts of their stories are corroborated by the two inmates. Riddle tells a story, uncorroborated in any respect, that the assault upon him was wholly unprovoked.

We are of the opinion that the findings of the referee that Riddle assaulted Stanley, that Stanley properly defended himself, and that force was necessary to compel compliance with the prison regulations, were correct, and should be and are adopted as the findings of this court.

So far as the claim that Riddle was kept segregated from the general prison population to cover up the beating is concerned, the evidence is all to the contrary. Riddle's record of infraction of prison regulations since May 1961, clearly supports the finding that Riddle's internment in the Adjustment Center was fully justified as a reasonable disciplinary measure. The finding of the referee to that effect is adopted as the finding of this court.

Petitioner makes much of the finding of the referee that "the *amount* of force" used by correction officer Stanley in striking petitioner on the head with a baton "is questionable as being fully justifiable," and contends that that finding means that Stanley used excessive force against him. We do not so interpret the finding. All that it seems to mean is that, looking at the matter after the event, probably Stanley hit the petitioner too hard. But the finding does not mean that Stanley was guilty of cruel, inhuman, or excessive punishment under the circumstances then existing. If the finding is subject to that interpretation it is disapproved, and this court finds that Stanley did not inflict cruel, or inhuman, or excessive punishment upon petitioner under the circumstances existing at the time of the fight.

The amount of force used cannot be measured by a micrometer, nor can it be considered separate and apart from the circumstances existing at the time. The three men were in or about to enter the locker room. Without warning or provocation Riddle hit Stanley on the jaw, bruising it and loosening two teeth. The three fell to the floor and Riddle hit or kicked Stanley. The latter, who was unarmed, reached for the baton, tried to subdue Riddle by hitting him on the kneecap, and when that failed hit him on the head. The last

blow had the desired effect. It is certainly too bad that Stanley hit him so hard. It is tragic that his skull was fractured. But Stanley, under the circumstances could not, reasonably, be expected to measure carefully the precise amount of force he should use. As was held in *In re Ferguson, supra,* 55 Cal. 2d 663, 673, Stanley had the right to use force "where necessary to prevent a prisoner from doing bodily harm to a prison official." We are of the opinion that the amount of force used, under the circumstances, was not excessive. While custodial officers will be held strictly to account for imposing cruel, inhuman or excessive punishment on prisoners, and while this court will always be alert to protect the basic rights of prisoners, guards are not to be censored because they defend themselves when attacked and use force to subdue recalcitrant prisoners.

The only remedy to which petitioner is entitled is that the record of the charges and punishment imposed upon him for allegedly making false statements in this petition should be expunged from his record. It is so ordered. In all other respects relief is denied.

The order to show cause is discharged, and the petition for this writ is denied.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., White, J., and Dooling, J., concurred.

Petitioner's application for a rehearing was denied July 11, 1962.