[Crim. No. 10856. First Dist., Div. Four. Nov. 27, 1972.]

In re LEONARD JOHN CIRINO on Habeas Corpus.

## COUNSEL

Homer W. Jones, Jr., under appointment by the Court of Appeal, for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier and Edward P. O'Brien, Assistant Attorneys General, Gloria F. DeHart and Timothy A. Reardon, Deputy Attorneys General, for Respondent.

James D. Boitano, District Attorney, and John N. Cooley, Assistant District Attorney, for Intervener.

## OPINION

**DEVINE, P. J.**—An order to show cause why a writ of habeas corpus should not issue was made by this court directed to Roy Wagner, M. D., Medical Director of Napa State Hospital. Petitioner, Leonard John Cirino, in petitioning for the writ does not seek to be released but to have conditions of his confinement, which he asserts to be unlawful, removed.

Petitioner was adjudged not guilty by reason of insanity of the murder by multiple blows by an axe of his 10-month-old daughter, and on December 24, 1969, was ordered delivered to Atascadero State Hospital until he shall have recovered his sanity. On February 16, 1972, petitioner was transferred by the Department of Mental Hygiene to the Napa State Hospital. On March 10, 1972, a clinical conference on the subject of allowing "grounds privileges" to the patient was held at the hospital. Three physicians and certain technicians were present. Present also was James Boitano, district attorney, who expressed the concern of Superior Court Judge William L. Blanckenburg of Napa County about lack of security at the hospital and the potential danger presented by the patient. The opinion of the doctors and technicians, as expressed in a form called "Progress Notes," was that the patient was impulsive and had a potential for violence, that the danger was small so long as he was receiving medication.

The question which we must answer was then considered: Does the superior court have jurisdiction to override the hospital's decision, if such be made, allowing the patient grounds privileges? Mr. Boitano took the matter under advisement. He soon replied that it was his conviction that grounds privileges would not be proper confinement for Mr. Cirino and he impliedly gave his opinion that the court did have jurisdiction. Dr. A. S.

Linn, medical program consultant, responded by letter that he believed the court had no right to restrict the hospital's program within the confines of the hospital grounds. Following this, and on April 5, 1972, Judge Blanckenburg made this order: "Pursuant to the provisions of Penal Code Section 1026, the court orders that defendant, LEONARD JOHN CIRINO, shall not be given grounds privileges at Napa State Hospital, and if such privileges have already been given him, they shall be forthwith revoked. [¶] The court further orders that the defendant shall be confined in such a manner that an opportunity for escape shall be held to a minimum consistent with the facilities available for such confinement at Napa State Hospital."

The petition for habeas corpus followed.

The Attorney General, representing Dr. Wagner, to whom the order to show cause was directed, took the position that because Dr. Wagner was obeying the order of Judge Blanckenburg, habeas corpus would not be a proper remedy against him, although prohibition might be directed, if the merits justified it, against the court. Later, however, the superior court, represented by the district attorney, intervened and filed a return, thus removing whatever technical defect there may have been in designating the party who was to respond.

The Attorney General disputes the availability of habeas corpus in another way, arguing that although the writ is available even to a person who is lawfully confined, in order to challenge an assertedly improper condition of the confinement the condition assaulted must involve denial of some basic or fundamental right. Such rights are those of religious freedom and to communicate with counsel (*In re Ferguson,* 55 Cal.2d 663 [12 Cal.Rptr. 753, 361 P.2d 417]), and to be protected against cruel and unusual punishment (*In re Riddle,* 57 Cal.2d 848 [22 Cal.Rptr. 472, 372 P.2d 304]). But petitioner has sufficiently shown that a basic right is involved, to be measured against rights of the People, as discussed below, to warrant presenting his cause by application for habeas corpus. He has submitted the report of A. S. Linn, M. D., medical program consultant, to the effect that he, the patient, can make no further progress unless he has graduated privileges, among which the doctor included grounds privileges; and the report of E. A. Gaw, M. D., staff psychiatrist, that grounds privileges would be psychologically strengthening, that prior to the court's order Cirino had performed entirely satisfactorily even with unescorted grounds privileges, that he has not done quite so well since the revocation and he is more seclusive.

Petitioner's counsel argues, not without logic, that the "grounds privi-

leges" are an integral part of the treatment and hoped for rehabilitation of the patient; that at some time the court must decide whether there has been recovery, and the court must then look to his progress which can be evaluated only by considering reports of his conduct, attitude and thought processes as they are exhibited in progressive stages of freedom, not as they would be in conditions of full security and restraint. The problem presented sufficiently touches primary concerns of petitioner to make it the proper subject of inquiry upon application for habeas corpus.

The positions of the parties, as stated in the petition, the returns and a traverse thereto, and at oral argument are: By petitioner, through his counsel, that the court does not have jurisdiction to make an order such as that of April 5, 1972, because the subject matter is reserved to the hospital personnel for decision. He remarks that no hearing was had before the court made its order, but protests that the absence of a hearing is of no consequence, jurisdiction itself being absent. The superior court, by the district attorney, contends that it does have jurisdiction under Penal Code, section 1026. The medical director, by the Attorney General, having complied with the court's order, takes the position, in his return, that the court does have jurisdiction. At argument the Attorney General suggested that a full hearing on the facts be had—perhaps by the superior court, perhaps by a referee.

We were informed, at oral argument, that the medical directors throughout the state are, understandably, eager to have a ruling on the subject of jurisdiction in deciding upon the manner of confinement. If the court does not have jurisdiction, an extensive hearing of the Cirino case itself would be useless. We do not deem it necessary for us to have more factual information than that now before us for resolving the problem of jurisdiction.

There is no explicit statutory declaration of continuing control by the superior court over the manner of confinement of a person who has been found not guilty of a crime by reason of insanity. Section 1026 of the Penal Code reads in part as follows: "If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law.

A defendant committed to a state hospital shall not be released from confinement unless and until the court which committed him, or the superior court of the county in which he is confined, shall, after notice and hearing, find and determine that his sanity has been restored. In the event such hearing is held in the county in which the defendant is confined, notice as ordered by the court shall be given to the district attorney of said county and also to the district attorney of the county from which said defendant was committed. Nothing in this section contained shall prevent the transfer of such person from one state hospital to any other state hospital by proper authority nor the transfer of such patient to a hospital in another state in the manner provided by law, upon order of the superior court in the county from which he was committed, or in which he is detained." (Stats. 1927, p. 1149.) Intervener, the superior court, contends that the imposing upon the court, by section 1026, of the duty to "direct that the defendant be *confined*" (italics ours) in the state hospital carries with it the power to make whatever orders are necessary to make the confinement effective until such time as the court, after notice and hearing, shall find and determine that his sanity has been restored. We agree with this contention. Our reasons are:

 1. The word "confine" means " 'To restrain within limits; to limit; . . . to shut up; imprison; to put or keep in restraint . . . to keep from going out.' " (*People* v. *Knowles,* 35 Cal.2d 175, 180-181 [217 P.2d 1].) The granting of "grounds privileges" may or may not be a lack of sufficient *confinement,* depending on many circumstances. Since we are considering *jurisdiction* at this point, it is sufficient to support the court's order that the subject matter of the order is adequate confinement, as required by the statute.

 2. The court's duty, and therefore its authority, does not end, as it does in the case of sentencing of a criminal, with execution of the commitment. Under section 1026 the court must, on application of the committed person or of the superintendent of the hospital, decide whether sanity has been restored. (Pen. Code, § 1026a.) This means full restoration and not merely ability to distinguish right from wrong (*People* v. *Mallory,* 254 Cal.App.2d 151 [61 Cal.Rptr. 825]). Meanwhile, as the section says, he "shall not be released from confinement." If the court does not have power to control the confinement, the important decision-making process may be frustrated by the patient's disappearance.

3. Support to this interpretation of section 1026 is given by Welfare and Institutions Code, section 7351, which forbids the parole or temporary absence provided for other patients to those who are held under section

1026 without court approval. Grounds privileges do not, to be sure, constitute parole. The point is not that section 7351 in itself answers our problem, but that patients held under section 1026 are subject to particular control. That "grounds privileges," if unlimited except by the boundaries of the hospital grounds at Napa State Hospital, may present dangers akin to, if not so great as, parole is not improbable, as discussed below.

4. It must be remembered that although, because of his derangement, petitioner has not been adjudged to be a criminal, and although he is remorseful for the deed (we are thus informed in the medical reports), nevertheless, he did commit what objectively was a violent homicide. We note the comment of R. C. Murphy, M. D., medical program director at the hospital, that the homicide was so singular (brought about by the delusion that the child would spend more time in hell if she lived longer), that it is extremely unlikely that the patient would kill anyone else. But we also note that the judge who issued the challenged order was the judge who heard the trial and observed petitioner and heard the whole story of the fatal episode.

5. Finally, we refer to the considerable number of escapes and "walk-aways" from Napa State Hospital as reported in the brief, later incorporated into the return, by the intervener, the superior court,[1] and in particular by the number of those deemed dangerous to themselves or to others. In the face of this record, we understand why the medical director himself

---

[1]"Napa State Hospital currently has a population of approximately 2400. This population has increased from a low of approximately 1500 during the first part of 1972. On any given day there are approximately 300 to 500 Napa State Hospital patients walking around on the grounds. During the time period of March 1, 1970 through December 31, 1970, there was a total of approximately 979 unauthorized absences. From January 1, 1971 through December 31, 1971, the total of unauthorized absences or attempts numbered approximately 1516. During the calendar year 1970 a total of 282 teletypes were sent on walkaways or escapees. Of this total 119 were classified by NSH as being a danger to themselves or others. During the calendar year 1971 the total number of escapees or walkaways where teletypes were sent numbered 452. Of this total, 246 were classified by NSH as being a danger to themselves or others. During the time period January 1972 through June 1972, a total of 449 escapees had teletypes sent on them. Of this total 228 had NSH designation as being a danger to themselves or others. A few cases in point:

"(1) July, 1972 a man who was charged with armed robbery and was subsequently placed in Napa State Hospital received a grounds privilege pass. This subject was Ray R. Mayorga. This subject is still at large.

"(2) In April and again in May, 1971 a subject walked away from Napa State Hospital who had a past history of threatening the life of President Nixon and the Vice President of the United States. Our records show that in November, 1971 this subject had escaped or walked away again.

"(3) A patient by the name of Richard Tevis, even though he had a past history of rape and stolen automobile, left NSH, stole a car, drove to Santa Cruz County, picked

agrees to the jurisdiction of the court, and why the district attorney is concerned about the safety of the People, especially of the county in which the hospital is situated. We conclude that section 1026, by its reference to the confinement, confers jurisdiction on the superior court to make effective the confinement of patients who have been found not guilty by reason of insanity.

As we have said, all of the parties desire a ruling on the matter of jurisdiction. This made, the court's order is to be sustained. But the determination of what to do with the patient is not a final one. He has not chosen, because of his challenge to the jurisdiction, to seek modification of the order. It is not suitable for us to suggest what remedies petitioner may seek, or what accommodation may be made between the requirements of security and those of rehabilitation. It is enough in this proceeding to decide the single question of the power of the court.

The petition for writ of habeas corpus is denied and the order to show cause is discharged.

Rattigan, J., and Bray, J.,* concurred.

---

up a woman, attempted to forcibly rape her, had an automobile accident, and the female victim was killed.

"(4) Just recently, a group of patients on leave from NSH stole a vehicle, drove to an adjoining county, had an automobile accident where a number of the patients were killed, as well as innocent victims being killed."

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.