[Crim. No. 76.   Department Two.—September 16, 1896.]

In the Matter of JOHN W. HOWELL, on Habeas Corpus.

Criminal Law— Perjury—Sworn Estimate by Bank Cashier—Commitment without Probable Cause—Habeas Corpus.—A bank cashier cannot be held.for perjury in swearing before the bank commissioners to a statement of the loans and discounts of the bank at their face value, in the absence of a showing that there was a willful failure and refusal on his part to exercise an honest judgment, and where there is no such showing, and it appears that the amount fixed as the value of the loans and discounts was reached as much in the exercise of the judgment of the commissioners in determining under the statements of the cashier what they believed to be good assets, as from any declarations of the cashier himself, there is no reasonable or probable cause for holding him for trial, and, if so held, he will be discharged upon *habeas corpus.*

Application in the Supreme Court for discharge upon writ of *habeas corpus.*

The facts are stated in the opinion of the court.

*Frank H. Farrar*, and *James F. Peck*, for Petitioner.

*F. G. Ostrander*, and *V. G. Fost*, for Respondent.

Henshaw, J.—The petitioner, John W. Howell, after examination before a justice of the peace in the county of Merced, upon a charge of perjury, was held to answer before the superior court of said county upon said charge. He claims that his imprisonment is illegal, in that he was committed to the custody of the sheriff of the county upon the charge of perjury without reasonable, probable, or any cause, and, in substantiation of

this claim, a transcript of all the evidence taken before the committing magistrate is brought before this court for consideration and review.

It appears from this evidence that the petitioner was cashier of the Merced bank. At the time of these occurrences the Merced bank was in liquidation. The bank commissioners of the state sought to learn whether or not the bank was actually insolvent, or whether by allowing it to continue in business it would be able to realize upon its assets and meet its obligations in the course of business as they fell due. For the purpose of acquiring this information, the said John W. Howell was put under oath by the commissioners, and interrogated as to the condition of the affairs of the bank. There had been prepared and presented to the commissioners a statement of the assets and liabilities of the bank, and as part of the assets there was an item of $176,000 for loans and overdrafts. A statement had likewise been prepared showing in detail the items which composed the $176,000 loans and overdrafts.

These items were made up of the names of the bank's debtors, alphabetically arranged, and opposite each name was set down the face value of the indebtedness. The total amounted to the sum of $176,000.

The cashier was charged with having falsely sworn that the loans and discounts were of the value of $176,-000, "whereas in truth, and in fact, the value of such loans and discounts was not then and there of the value of $176,000."

The principal witness in support of this charge was J. B. Fuller, one of the bank commissioners. His testimony in chief amounted substantially to this, that, with the statement in his hand showing in detail the debtors of the bank, he interrogated the cashier as to the value of each item on the list, and that the cashier told him that the claims were collectible and good. It is not pretended that the cashier ever swore that the value of the loans and overdrafts was $176,000, but that he made representations, while under oath to the bank

commissioners, that the separate items aggregating $176,000 were good and valid assets. There is nowhere in the record any evidence that the cashier did not answer fully and fairly, and in accordance with his best judgment upon the matter of these items. There is no evidence that any of the items were false, or simulated or manufactured, or that the statements of the cashier were willfully made, and in perversion of the truth, and not in the exercise of his best judgment, however faulty that judgment may have been.

When the evidence of the witness Fuller comes to be analyzed, it abundantly appears that the sum of $176,-000 was not accepted as a direct and positive statement made under oath by the cashier of the value of the assets, but that the same was reached in the exercise of a common judgment upon the part of the cashier and of the bank commissioners, in estimating the value of these assets. It is quite true that in most cases the information as to the value was derived from the statements of the cashier, but, as has been said, it nowhere appears that the cashier either suppressed the truth or made declarations willfully false, or did anything but express his own opinion and judgment upon the value, and even after he had so done, many of the items credited as valid assets were so credited in the independent exercise of the judgment of the commissioners. To illustrate: One item was W. P. Applegate, $3,550.30. Bank commissioner Fuller is asked: " Q. What value did Mr. Howell place upon that? A. He said it was good after the court decided it was good. It was left with the court. He reported to me just that, that the court said the bank would have to wait, that they would probably get it. Q. Is that what you call reporting a good asset? A. Yes, I think it is a good asset. Q. If there was a probability of getting it, you would call it a good asset? A. In a bank liquidation, yes. Q. Then if it was doubtful, you would put it in as good ? A. Yes, a doubtful one, yes."

It was under these circumstances that this item was

marked good by the bank commissioner. Again, the
witness is asked as to a claim of $119.60, what report
Howell made as to that, and the answer was that he re-
ported it "good in part, perhaps all. Q. What value
did you set on that? A. The full value. Q. That was
considered good for all? A. I should say so. It
seemed that there was a probability of collecting it."
Still again, the witness being interrogated as to certain
notes which the cashier told him were in suit, says:
"You could not know how the suit was going to be de-
cided; until it was decided you could not tell how much
you was going to get out of it. When he said a note
was in suit I would put it down good, because you could
not say it was bad. Q. Notes that were in suit you
would call good? A. Yes, sir. Q. In this statement
all the notes reported to you as in suit you put down
good? A. Yes, sir; could n't write it off. You could n't
say it was bad until the court had so decided. Q.
Whenever Mr. Howell told you one of these notes was
in suit, and might be collected at the end of a lawsuit,
you put that down as a good asset? A. For a bank in
liquidation, yes."

The witness further testified that as to many of the
items, amounting in the aggregate to over $10,000,
the cashier told the commissioners that he "thought the
claims were good." All of these items which the cashier
declared that he thought were good were entered by the
bank commissioners as collectible assets of full face
value.

Numberless other extracts might be made from the
evidence showing the nature of the cashier's testimony,
and the method by which the bank commissioners
reached their conclusion. It would but unduly and un-
necessarily extend this consideration to notice them all.
One further example, however, should be given. At the
close of this examination before the bank commission-
ers, when the discussion became general upon the ques-
tion of the bank's solvency, the same witness, Fuller,
bears testimony as follows: "The cashier was there,

and we talked to him about the solvency of the bank. He said, in so many words, that, with a good season, there would be no doubt of the bank paying every dollar it owed. Q. It was a qualified statement? A. Yes, sir. Q. If they had a good season? A. Yes."

The result of it all was, by Fuller's own testimony, that of the items composing the $176,000 the cashier had reported $12,000 to be of no account, and over $14,000 he "thought to be good," while many others, without any concealment or evasion upon the part of the cashier, and under a plain statement of facts, were set down by the commissioners themselves as being good.

The only evidence to prove the falsity of the cashier's statement was evidence of other witnesses conversant with the value of real estate, or with the financial standing of the debtors of the bank, who, testifying that they rejected all claims which they did not feel certain were collectible, made the cash value of the assets, as it naturally would be, very much less than the result reached by the bank commissioners, who allowed full value for every item which was not demonstrated to be totally bad.

There was in this evidence no reasonable or probable cause for holding the defendant for trial. It appears throughout, as has been said before, that the defendant was giving to the commissioners his judgment upon matters of extreme uncertainty, the value and collectibility of debts. We do not mean to say that, even in a matter calling for the exercise of judgment, a perjury might not be predicated if one willfully and wickedly and maliciously refrained from exercising and giving expression to the exercise of his best judgment, if in law he was bound so to do. But, in the absence of a showing that there was such a willful failure and refusal to exercise an honest judgment, a charge of perjury could not be successfully maintained. And, moreover, as appears from the quotations above made, the fixed sum of $176,000 was reached quite as much in the exercise of the judgment of the commissioners in deter-

mining under the statements of the cashier what they believed to be good assets, as from any declarations of the cashier himself.

Let the prisoner be discharged.

McFARLAND, J., and TEMPLE, J., concurred.