[Crim. No. 4721. In Bank. Aug. 9, 1946.]

THE PEOPLE, Respondent, v. ANTONIO SANTIAGO MENDEZ, Appellant.

Walter L. Gordon, Jr., Everette M. Porter and Erskine Stevenson Ragland for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SHENK, J.—This is an appeal by the defendant from an order denying his petition for a writ of error *coram nobis*, the purpose of which was to set aside his plea of guilty to the charge of murdering his paramour and to vacate the judgment imposing the death penalty.

The defendant was charged by information filed August 3, 1944, with the murder of Maude Pearl Farrington. At his arraignment on August 7, 1944, he pleaded not guilty, the public defender was appointed to represent him, and the cause was set for trial on October 10, 1944. On October 5, 1944, at the request of John Hill, the deputy public defender assigned to represent the defendant, the date of the trial was reset for October 23d. On October 23, 1944, the defendant withdrew his plea of not guilty. Upon rearraignment he pleaded guilty and the court proceeded to hear evidence to determine the degree. The defendant admitted that he killed the deceased and attempted to demonstrate that it was an accident. The trial court discredited his explanation, found him guilty of murder in the first degree and imposed the death penalty. On appeal this court affirmed the judgment (*People* v. *Mendez* [September 25, 1945], 27 Cal.2d 20 [161 P.2d 929]). On November 9, 1945, the defendant was re-sentenced and his execution was set for February 1, 1946. This petition for a writ of error *coram nobis* was then filed in the superior court. The defendant was taken to Los Angeles from San Quentin and hearings were held on January 9, 10, and 11, 1946, at the conclusion of which the order from which this appeal was taken was made.

Two contentions are made on appeal: First, that the

trial court committed prejudicial error in refusing to set aside the plea of guilty and vacate the judgment. In passing upon the petition for the writ of error *coram nobis* the trial court had before it the extensive evidence taken at the hearings on the petition and the decision of this court in affirming the judgment wherein the facts were set forth at length and the questions raised on the appeal were passed upon. The circumstances attending the change of plea are there set forth. To entitle the defendant to relief by way of the writ of error *coram nobis* he must show that some fact existed which, without any fault or negligence on his part, was not presented to the court at the trial on the merits, and which if presented would have prevented the rendition of the judgment. (*People* v. *Gilbert*, 25 Cal.2d 422, 442 [154 P.2d 657].)

No facts were presented by the defendant relating to his change of plea which in substance and effect were not before the court at the trial on the merits and on the former appeal. The proceedings on rearraignment were free from error and on the subsequent proceeding to set aside his plea of guilty the court was properly guided by the facts and the law and no error was committed in its ruling in this connection.

The second contention is that the defendant was denied counsel of his own choice and therefore was denied due process. The determination of this contention depends upon the sufficiency of the evidence to support the conclusion of the trial court to the contrary.

The defendant testified that prior to his arraignment and the appointment of counsel to represent him, he tried to communicate by telegraph with two private attorneys, Walter Gordon who now represents him, and Maurice Gleason; that he gave two telegraph messages with money for their transmission to deputy sheriffs at the county jail; that he did not receive a reply; that he had the funds to employ private counsel; that he and his wife had a talk at the county jail with Deputy Sheriff Raymond Hopkinson who was the investigating officer and who advised that the public defender would furnish him with proper representation; that when he was arraigned on August 7, 1944, he was represented by John Hill, a deputy public defender, and he pleaded not guilty; that neither the court nor Mr. Hill advised him of the penalty the law empowered the court to impose on a plea of guilty; that Mr. Hill advised him that if he changed his plea to guilty the court would not fix more than second de-

gree with a maximum of life imprisonment; that he was satisfied with Mr. Hill's efforts when he pleaded guilty but sometime during the hearing to determine the degree he became dissatisfied; that he knew he was charged with the murder of Mrs. Farrington; and that he also knew that the death penalty was one of the penalties for murder in this state.

Mr. Hill, who had been a member of the public defender's office since 1927, during which time as counsel for the accused he averaged five murder cases a year, testified that when the defendant was arraigned he represented the public defender on all motions, pleas and the setting of cases for trial on the master calendar; that prior to the defendant's arraignment, he interviewed him for a period of about 30 minutes; that after the defendant entered the plea of not guilty the case was set for trial on October 10, 1944, in Department 41; that after the arraignment he temporarily dropped out of the case and that the cause was assigned to Lloyd Robinson, the deputy representing the public defender in Department 41; that on October 1, 1944, he was assigned to trial work in Department 41 and then took over the case; that he next saw defendant sometime between October 1 and 5, 1944; that on October 5th he made a motion for continuance on the ground of lack of sufficient time for preparation, which motion was granted; that before the defendant pleaded guilty to the charge of murder he had interviewed him eight or nine times in the county jail; that he advised the defendant as to the degrees of murder and the penalty for first degree murder as either death or life imprisonment, and of his right to engage private counsel; that he asked defendant if there were any witnesses to be interviewed and subpoenaed in his behalf, and the defendant named a Mrs. Quisenberry, but said he did not want to involve either her or his wife in the trial, and that there were no other witnesses; that he and the defendant together went over the transcript of the preliminary hearing during which he asked the defendant what was correct and what was not correct, and to explain certain episodes referred to in the evidence; that he advised defendant of his right to trial by jury and the defendant stated he believed he would rely on the judge; that he later informed the defendant that the trial judge would not accept a waiver of a jury because of the nature of the first degree murder charge and the matter of the penalty in the event of a conviction, and that it seemed likely that he would have to be tried by a jury; that defendant asked if he could plead

guilty to an offense less than murder; that later he advised defendant that Mr. Leavy, a deputy district attorney, would not consider a plea of guilty to manslaughter or to second degree murder and intended to do all he could to obtain the extreme penalty; that defendant stated he was afraid of a jury with women on it, as the victim was a woman, and asked what the result would be if he pleaded guilty to murder; that he informed defendant that the court would take evidence and determine the degree of the crime, that he would urge the court to determine it to be murder of the second degree, and if the court determined it to be first degree murder, he would urge the court to fix the punishment at life imprisonment; that he told defendant to think it over and he would see him the next day; that on the next day the defendant said he was going to plead guilty and leave it to him to do his best to have the offense determined as second degree and the punishment fixed at life imprisonment; that he told the defendant that he could not assure him of anything except that he would put forth his best efforts, striving to convince the court that the homicide was not premeditated but was the result of the reckless and negligent manner in which the gun was handled at the time of the discharge of the second shot; that he did not tell the defendant that if he would plead guilty he would receive a sentence of second degree murder and under no circumstances would he be given more than life imprisonment, but told defendant that if the court fixed the offense as murder of the second degree he would get a life sentence as a maximum; that no member of the district attorney's office, either directly or indirectly, led him to believe that no punishment other than the death penalty would be sought by that office; that at no time did he have a conference with the judge who tried the case concerning the merits of the case; and that the court was not previously informed of the fact that the defendant was going to change his plea.

Deputy Sheriff Hopkinson testified that he was one of the investigating officers in the case; that he had several conversations with the defendant; that prior to the defendant's arraignment and at a time when Mrs. Mendez was visiting him in the attorneys' room, the employment of counsel and their lack of funds were discussed, and he told both of them that the state provided the public defender and if the defendant informed the court that he was without funds, the court would appoint the public defender to represent

him, and that there were good attorneys in the public defender's office; that he did not tell the defendant not to hire a private attorney; that he had a stop order on the defendant's mail and that he recalled a letter addressed to Mr. Gleason, an attorney, asking him to call on the defendant at the county jail; that he did not remember any telegrams being sent by the defendant although the stop order would extend to them as well as to letters.

Deputy Sheriff O. R. Bremer testified that he was in charge of the records showing the attorneys who called on persons detained at the county jail; that his records of visits of persons from the public defender's office showed that Mr. Hill visited the defendant on August 2d, September 27th, October 18th, and October 20th, and that Robert W. Robinson, Jr., another attorney from the public defender's office, visited the defendant on September 15, 1944; that the records of private attorneys visiting their clients showed that attorneys Abbott C. Bernay and David C. Marcus visited the defendant on July 18 and 19, 1944, respectively; that he was the custodian of the record of telegraph messages sent from the county jail; that he made a search of the records for messages sent by the defendant, and that between July 3 and October 21, 1944, the only telegram sent by him was one to Marian Quisenberry.

Mrs. Mendez testified that Mr. Hopkinson told the defendant and her not to get a private attorney but to have the public defender; that although the defendant asked her to get a private lawyer for him she did not do so; that they did not have any money at all when they were talking about getting a lawyer; that the defendant told her to see Mr. Gordon, and that defendant did not tell her to see Mr. Gleason.

It was stipulated that if Mr. Gleason or Mr. Gordon were called as witnesses they would testify that they had no recollection of receiving any communication from the defendant.

On the evidence presented the trial court was justified in concluding that the defendant was not denied counsel of his own choice and was duly and ably represented by the public defender at his trial.

The order is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.