[Crim. No. 7212. In Bank. Dec. 3, 1963.]

In re PAUL KERN IMBLER on Habeas Corpus.

558

Gregory S. Stout, Charles Hollopeter, Warren L. Ettinger, Albert C. Garber, Ellery E. Cuff, Public Defender (Los Angeles), Richard S. Buckley, Deputy Public Defender, Jules C. Goldstone and Low & Stone for Petitioner.

Stanley Mosk, Attorney General, John S. McInerny and Albert W. Harris, Jr., Deputy Attorneys General, William B. McKesson, District Attorney (Los Angeles), and Harry Wood, Deputy District Attorney, for Respondent.

TRAYNOR, J.—Petitioner was convicted of first degree murder and of assault with a deadly weapon with intent to commit murder. The jury fixed his penalty at death. This court affirmed the judgment and an order denying a motion for new trial. (*People* v. *Imbler*, 57 Cal.2d 711 [21 Cal.Rptr. 568, 371 P.2d 304].) In this proceeding, petitioner seeks a writ of habeas corpus, *coram vobis*, or other appropriate relief.

On January 4, 1961, two men entered a Los Angeles market, one of them shot and fatally wounded Morris Hasson, the proprietor, and they departed in different directions. The only eyewitness to the crime, Hasson's wife, was unable to identify the man who did the shooting, but later identified his accomplice. A passerby, Alfred Costello, ran toward the market when he heard the shot, and at the lighted entrance encountered a man leaving the store with a gun in his hand. Costello chased the killer through several parking lots adjacent to the store; the killer shot at Costello and dropped his hat and coat while making his escape. A pistol, later identified as the murder weapon, a razor in a plastic case, and a soiled handerchief were in the coat.

Entirely on the basis of the identification testimony of several witnesses, petitioner was convicted of murdering Hasson in the perpetration of an armed robbery and of assault with intent to murder Costello. All attempts to tie the physical evidence at the scene of the murder to petitioner were fruitless, and a police expert testified that fingerprints on the murder weapon and on the razor and its case were too fragmentary to assign to anyone. Petitioner was identified as the man who left the store with a gun by Costello, who had seen the killer at the entrance of the store and again during the chase, by Billy Hillen, who was leaving the store as the two men entered and who testified that he had clearly seen them again as they left, and by Alonzo Dunlap, who was an attendant at one of the parking lots through which the killer escaped. Hillen and Mrs. Hasson identified the other man at the killing as Leonard Lingo, an accomplice of petitioner in an attempted robbery in Pomona on January 14, 1961. During this January 14 attempt, Lingo was killed and another accomplice, Jerry Mayes, was captured. On January 15, Imbler surrendered to the Pomona police.

Petitioner testified that he first met Lingo, whose identity as the accomplice of the killer was not disputed, on the morning of January 14 and that he spent the evening of January 4 with several other persons in various Los Angeles bars. Both alibis were corroborated by Mayes, his accomplice in the January 14 robbery attempt.

The petition alleges that the prosecution secured petitioner's conviction through the knowing use of perjured testimony and that newly discovered evidence completely undermines the entire structure of the case on which the prosecution was based. After examining the petition and the affida-

vits attached to it, we issued an order to show cause and appointed the Honorable Thomas P. White, retired Associate Justice of this court, as referee to take evidence directed to the following questions:

"1. Did any witness who testified against Paul Kern Imbler in the trial which resulted in the judgment of conviction, affirmed by this court in *People* v. *Imbler,* 57 A.C. 757 [57 Cal.2d 711 (2 Cal.Rptr. 568, 371 P.2d 304)], commit perjury as defined in the Penal Code of the State of California?

"2. In the event that any witness did commit perjury, did any representative of the State of California cause or suffer such testimony to be introduced, knowing such testimony as given was perjured?

"3. Did any representative of the State of California suppress or prevent the introduction of any evidence which, had it been given, would have been favorable to the defense of Paul Kern Imbler?

"4. What if any new evidence has been discovered that undermines the case presented by the prosecution at the time of the judgment of conviction of Paul Kern Imbler?"

█ A judgment of conviction based on testimony known by representatives of the state to be perjured deprives the defendant of due process of law (*Mooney* v. *Holohan,* 294 U.S. 103, 112-113 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]; *Pyle* v. *Kansas,* 317 U.S. 213, 216 [63 S.Ct. 177, 87 L.Ed. 214]) and may be attacked on habeas corpus (*In re Mooney,* 10 Cal.2d 1, 15 [73 P.2d 554]; *In re Lindley,* 29 Cal.2d 709, 722 [177 P.2d 918]; *In re Horowitz,* 33 Cal.2d 534, 537 [203 P.2d 513]). █ In making such an attack, however, petitioner must establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew that it was perjured (*In re Mooney, supra,* at p. 15; *In re Lindley, supra,* at p. 722), and that such testimony may have affected the outcome of the trial (*Napue* v. *Illinois,* 360 U.S. 264, 272 [79 S.Ct. 1173, 3 L.Ed.2d 1217, 1222-1223]; see *In re De La Roi,* 27 Cal.2d 354, 365 [164 P.2d 10]; *In re Mitchell,* 35 Cal.2d 849, 856 [221 P.2d 689]).

█ Petitioner alleges several instances of knowing use of perjured testimony. He first attacks Costello's identification testimony. At the preliminary hearing and at the trial, Costello identified petitioner as the man he chased, but when asked at the reference hearing if petitioner was that man, he testi-

fied that "at this time I will have to say no." This change in testimony alone does not constitute perjury, but merely indicates that Costello changed his mind. The pertinent inquiry is whether he testified at the trial contrary to his belief at that time. (See *People* v. *Von Tiedeman,* 120 Cal. 128, 134-137 [52 P. 155].)

More than a year after the trial and several months before the reference hearing, Costello was interviewed by the police. A tape recording of that interview (the accuracy of which was challenged by Costello) disclosed that when asked if he had any doubts about his identification of petitioner at the trial, he answered: "No at that time there was no doubt. ... I'm not worried about perjury because I don't think I perjured myself. I answered the question to the best of my knowledge and recollection." At the hearing, however, Costello claimed that he always had grave doubts about his identification. The referee found that he "testified of his own free will as to such identification based upon his own knowledge as disclosed by his testimony at both the preliminary examination and the trial of Petitioner in the Superior Court."

At the reference hearing, Costello also testified that he had told the police that he was extremely reluctant to testify because of his doubts, but that they had forced him to testify by holding some bad check charges over him. This charge was categorically denied by the police officers involved although they admitted having knowledge of several outstanding bad checks issued by Costello and of his previous convictions for issuing such checks. The referee found that the record "reflects definitely that no threats of any character were made to Costello with regard to the aforesaid worthless checks." Costello also testified that he had expressed doubt about his identification, both before and after the trial, to at least 16 state officials, including members of the Los Angeles Police Department, members of the Vernon Police Department, members of the staff of the Los Angeles District Attorney, and two judges of the Superior Court of Los Angeles County. Testimony and affidavits from these persons uniformly denied that Costello expressed such doubts to them. In fact, some of them stated that he seemed quite certain and unshakable in his identification of petitioner. The prosecuting attorney and a police officer testified that they talked to Costello before he testified at the trial to impress upon him the seriousness of his identification and to tell him that there would be no disgrace in withdrawing it if he were unsure.

Costello replied: " 'I'm positive. I know it's serious to be wrong. I have been convicted myself of a felony, so I know how serious it is. I'm positive in my identification.' " The referee found "that at no time either before or after the trial of Petitioner Imbler on the charge of murder, which resulted in his conviction, did the witness Alfred Costello express to any representative of the State of California a doubt as to his identification of Petitioner Imbler as testified by the witness Costello."

We adopt both of these findings involving Costello's allegedly perjured identification. Although we are not bound by the findings of a referee (*In re Mooney,* 10 Cal.2d 1, 17 [73 P.2d 554]), they are entitled to great weight (*In re Riddle,* 57 Cal.2d 848, 853 [22 Cal.Rptr. 472, 372 P.2d 304]; *In re Martinez,* 52 Cal.2d 808, 812 [345 P.2d 449]; *In re Mitchell,* 35 Cal.2d 849, 855 [221 P.2d 689]). After a full hearing, the referee disbelieved most, if not all, of the changes that Costello made in his trial testimony and the charges he made at the reference hearing. He found "that the testimony given by said Alfred J. Costello at the Reference Hearing, which varied from his testimony at the murder trial, was thoroughly impeached and discredited by numerous witnesses, while the testimony of said Alfred J. Costello, as given at the murder trial concerning his identification of Petitioner is corroborated by the testimony of witnesses Billy Hillen and Alonzo Dunlap, and is consistent with other circumstances in the case. ..." The referee had the opportunity to observe the witness and judge his credibility and demeanor. (See *In re De La Roi,* 27 Cal.2d 354, 364 [164 P.2d 10]; *In re Marvich,* 27 Cal.2d 503, 516 [165 P.2d 241].) The transcript of the hearing reveals many ambiguities and inconsistencies in Costello's testimony that convince us that the referee was fully justified in making this finding.

■ Petitioner alleges that Costello perjured himself when questioned about seeing photographs of petitioner. Costello testified at the reference hearing that petitioner's mug shot was shown to him many times before the lineup where petitioner was identified, and "as I recollect back, there was a little psychology that they used on me by showing me the picture continuously. The image of Imbler, naturally, became imbedded in my mind, and when I saw the man in the lineup, it was a recollection of the picture not of the man that had entered the store. It was a little psychology that they worked." The investigating police officer admitted at the

reference hearing that he showed the photograph of petitioner from the Los Angeles Police Department files once to all of the witnesses before the lineup. He presented it with photographs of about a dozen similar-looking men, and each of the witnesses identified petitioner's photograph as that of the killer.

Costello's position on this point is not clear. At the trial, he first stated upon cross-examination that he had not seen any mug shots of petitioner before the lineup; after further questioning, he stated that he was "not positive, but certain" that he had seen mug shots of petitioner in a mug book before the lineup, but that he had kept his identification to himself. At the reference hearing, Costello presented a third version of the facts; he claimed that the police showed mug shots of petitioner to him several times before he helped in making the composite drawing of the killer, which closely resembled petitioner and was admitted into evidence at the trial.

The police denied showing any photographs of petitioner to Costello before the drawing was completed. The composite drawing was completed on January 18, 1961, and the Los Angeles Police Department's files show that petitioner's file, which presumably contained his photograph, was not released to officers investigating the Hasson murder until January 25. Costello testified that some of the mug shots he was shown were taken by the Pomona police when petitioner turned himself in for the January 14 robbery attempt, but the Pomona photographs were not taken until January 17, and the investigating officer from the Los Angeles Police Department testified that he did not receive them until January 20 and never showed them to any of the witnesses. Moreover, it appears that petitioner first came to the attention of the Los Angeles police as a suspect when an officer who had talked to him when he turned himself in for the Pomona robbery saw a resemblance between him and the completed composite drawing. It therefore appears that petitioner's photograph was not shown to Costello before the composite drawing was made.[1]

---

[1] An officer of the Vernon Police Department, called by the State to demonstrate Costello's certainty as to his identification, testified that between January 10 and January 15, 1961, Costello told him that he "was able to select one picture of an individual who was the suspect or who did the shooting in this particular case" and that he "was very sure about it." In light of all of the contrary evidence, however, the

The referee found that "the witness Alfred J. Costello was not induced by any representative of the State of California to unwittingly or otherwise make a false identification of Petitioner Imbler. ..." The evidence supports this finding and fails to establish that Costello wilfully gave false testimony at the trial about seeing petitioner's photograph. His testimony at the reference hearing shows that he was confused about when he saw a photograph of petitioner and the form of that photograph. In any event, Costello's testimony at the trial apprised the jury that he may have been "preconditioned" to identify petitioner at the lineup. (Compare *Napue* v. *Illinois*, 360 U.S. 264, 270-271 [79 S.Ct. 1173, 3 L.Ed.2d 1217, 1221-1222].)

Petitioner also alleges that several times Costello perjured himself in answering questions involving his credibility. At the trial, Costello was cross-examined about his criminal record and testified that he had only one felony conviction; his "make sheet," introduced at the reference hearing, showed that in fact he had two felony convictions. Costello was also cross-examined about his commitment to state mental hospitals. On redirect examination, he attempted to rehabilitate himself by testifying that since the time of his release from these hospitals, he had received degrees from the University of California (completing a four-year course in two years) and the University of Southern California (receiving an "Engineer's Degree"). This statement was established as false at the reference hearing.

False testimony affecting a witness's credibility is perjured if wilfully given (*People* v. *Barry*, 63 Cal. 62, 64-65; *People* v. *Lem You*, 97 Cal. 224, 226-227 [32 P. 11]; *People* v. *Low Ying*, 20 Cal.App.2d 39, 42-43 [66 P.2d 211]),[2]

witness was probably confused as to the date, for he had previously testified that he did not know the date of this conversation because of Costello's frequent visits.

[2] As to Costello's trial testimony regarding his college education, the referee found "that the foregoing false testimony does not constitute perjury as defined by the Penal Code of the State of California (§§ 118, 125) in that said testimony was not given as to any fact material to the essential issues involved in the trial of Petitioner Imbler." (No finding was made as to Costello's trial testimony regarding the number of his felony convictions.) False testimony concerning the credibility of a witness is material, however, and may be the basis of a conviction for perjury. (*People* v. *Barry, supra*; *People* v. *Lem You, supra*; *People* v. *Low Ying, supra*.) Arguably, Costello's educational achievements are technically immaterial to show rehabilitation from insanity, but in a perjury case, "the ordinary test of materiality is whether the testimony

and such testimony would require that the conviction be overturned if representatives of the state had knowledge of its false nature and if it might have affected the outcome of the trial (see *Napue* v. *Illinois,* 360 U.S. 264, 269-270 [79 S.Ct. 1173, 3 L.Ed.2d 1217]; *People* v. *Savvides,* 1 N.Y.2d 554, 557 [154 N.Y.S.2d 885, 136 N.E.2d 853]). Petitioner, however, failed to prove knowledge of these falsehoods by representatives of the state. No evidence was introduced at the reference hearing to show that any person connected with the prosecution knew of Costello's educational background. The prosecutor examined him about his college degrees on redirect examination only because Costello had informed him that he had several degrees during a recess immediately after the cross-examination. The prosecutor had no reason to disbelieve this information, which was first given to him during the course of the trial, and he had no duty to verify it before using it to rehabilitate his witness. (See *In re Horowitz,* 33 Cal.2d 534, 540 [203 P.2d 513].) Petitioner contends that the prosecutor had Costello's "make sheet," which listed all of his prior convictions, before him at the trial. The referee found, however, that petitioner's counsel had the same "make sheet" in his possession during the trial, yet failed to use it to correct the false testimony. If the prosecutor is to be charged with knowledge of the contents of the "make sheet," so must petitioner. (See *In re Manchester,* 33 Cal.2d 740, 742 [204 P.2d 881]; *Taylor* v. *United States,* 229 F.2d 826, 833-834; *Green* v. *United States,* 158 F.Supp. 804, 809; cf. *People* v. *Adamson,* 34 Cal.2d 320, 329 [210 P.2d 13]; *In re Mitchell,* 35 Cal.2d 849, 856 [221 P.2d 689].)[3]

given could have probably influenced the tribunal before which the cause was being tried. ..." (*People* v. *Barry,* 153 Cal.App.2d 193, 209 [314 P.2d 531]; accord *People* v. *Di Giacomo,* 193 Cal.App.2d 688, 699-700 [14 Cal.Rptr. 574]; *People* v. *Macken,* 32 Cal.App.2d 31, 41 [89 P.2d 173]; *People* v. *Dunstan,* 59 Cal.App. 574, 584 [211 P. 813].) This testimony "could have probably influenced" the jury to consider Costello rehabilitated after his capacity and competence as a witness had been put into question on cross-examination.

[3]Petitioner also contends that Costello perjured himself on redirect examination when he testified that his commitment to state mental hospitals was "voluntary." It was established at the reference hearing that he was committed under section 1026 of the Penal Code when he was found not guilty of a criminal charge by reason of insanity. Thus, petitioner argues that the commitment was not voluntary. At the trial, however, Costello apparently only meant that he voluntarily pleaded not guilty by reason of insanity. The following question and answer appear in the redirect examination of Costello:

██ Petitioner contends that the testimony given by the police fingerprint expert at the trial was perjured. ██ If any representative of the state connected with the prosecution either gives perjured testimony or knows that other prosecution witnesses have perjured themselves, the writ will issue. It is immaterial that the prosecuting attorney himself did not have knowledge of the perjury. (*Curran* v. *Delaware*, 259 F.2d 707, 713; see *In re De La Roi*, 27 Cal.2d 354 [164 P.2d 10]; *In re De La Roi*, 28 Cal.2d 264 [169 P.2d 363]; *Pyle* v. *Kansas*, 317 U.S. 213 [63 S.Ct. 177, 87 L.Ed. 214]; cf. *In re Mitchell*, 35 Cal.2d 849, 855 [221 P.2d 689]. But see *In re Allen*, 47 Cal.2d 55, 59-60 [301 P.2d 577]. Compare *Brady* v. *Maryland*, 373 U.S. 83, 87-88 [83 S.Ct. 1194, 10 L.Ed.2d 215, 218].)

██ The expert testified at the trial that there were two fingerprint fragments on the plastic razor case found in the pocket of the coat dropped by the killer and that neither was sufficiently well defined to be assigned to anyone. At the reference hearing, an expert produced by petitioner testified that there were three fingerprints on the razor case and that although two were too fragmentary to identify, the third could be identified and was definitely not petitioner's. The police expert at the reference hearing at first testified that there were only two fingerprints on the case. Upon examining his photographs of the fingerprints, he corrected himself and stated that there were three. He repeated again that all were insufficient to identify. After being instructed on cross-examination to examine his photographs overnight, however, he admitted the next day that one could be identified and that it was not petitioner's.

There is certainly an inconsistency in this prosecution witness's testimony at the reference hearing, but it appears that he first came to the conclusion that one of the fingerprints on the razor case could be identified as not being petitioner's during a recess in the hearing itself. There is no indication that he intentionally gave false testimony at the trial as to the number of fingerprints or as to whether they were identi-

---

"Q. And what were the circumstances of your voluntarily committing yourself?

"A. Well, in '46 and '47 when I was committed to Mendocino, I got in a little trouble with the law and I was represented by the Public Defender's Office at that time, and it was suggested to me that I enter a plea of not reasonably—not guilty by reason of insanity, and I was furnished a copy with the right answers to give the doctors at that time, which caused me to be committed to Mendocino."

fiable. An honest error in expert opinion is not perjury even though further diligence and study might have revealed the error. (See *In re Howell*, 114 Cal. 250, 254 [46 P. 159]; *People* v. *Von Tiedeman*, 120 Cal. 128, 136-137 [52 P. 155]; *In re Lindley*, 29 Cal.2d 709, 723 [177 P.2d 918].)

 Petitioner contends, however, that the fingerprint expert was negligent in analyzing the fingerprints and in testifying that they were too fragmentary to identify. He asserts that we should now recognize that the negligent presentation of false testimony is as damaging as the knowing use of perjured testimony and that, therefore, the judgment should be set aside. The issue of the expert's negligence was not presented to the referee; even if we assume, however, that the expert was negligent, his negligence did not deprive petitioner of a fair trial. We have no doubt that negligence of representatives of the state in preparing and presenting a criminal prosecution could in some cases result in a denial of a fair trial. (See *People* v. *Kidd*, 56 Cal.2d 759, 769-770 [16 Cal.Rptr. 793, 366 P.2d 49]; *People* v. *Carter*, 48 Cal.2d 737, 747 [312 P.2d 665]; *United States* v. *Heath*, 147 F.Supp. 877; cf. *Kyle* v. *United States*, 297 F.2d 507, 511; *United States* v. *Consolidated Laundries Corp.*, 291 F.2d 563, 570-571.) Police investigators, however, are not infallible, and it is the basic purpose of the trial to determine whether they were correct in asserting the defendant's guilt. Unless their negligence has obstructed the defendant in challenging the case against him, it is not a ground for collateral attack. The razor case and the fingerprints on it were available to petitioner throughout the trial for his own examination. Moreover, proof that someone else had handled the razor case would not have absolved petitioner or conflicted with the evidence against him. The testimony of the police expert did not interfere with the presentation of petitioner's defense, and had petitioner considered it advantageous to present further fingerprint evidence, he could have done so.

Petitioner contends that in several instances the state suppressed evidence favorable to him. Evidence of suppression of material evidence has usually been considered in connection with a claim that the state knowingly used perjured testimony to secure a conviction. (*In re Mooney*, 10 Cal.2d 1, 15 [73 P.2d 554]; *In re Lindley*, 29 Cal.2d 709, 722 [177 P.2d 918].) Moreover, suppression by the state of material evidence alone deprives a defendant of due process of law. (*In re Razutis*, 35 Cal.2d 532, 535 [219 P.2d 15];

*Brady* v. *Maryland,* 373 U.S. 83, 87 [83 S.Ct. 1194, 10 L.Ed. 2d 215, 218], affirming 226 Md. 422, 427 [174 A.2d 167]; *United States* ex rel. *Almeida* v. *Baldi,* 195 F.2d 815, 820 [33 A.L.R.2d 1407].) ▅ Petitioner contends that the police prevented the appearance of one witness favorable to him and "quietly pushed" him out of Los Angeles before the trial. This witness, James Fritz, was standing near Billy Hillen when the killer rushed by, encouraged Hillen and Costello to stop him, and joined Costello in chasing him, but he did not testify at either the preliminary hearing or the trial. The referee found that this contention "is utterly barren of evidentiary support in the record. I find that the record herein demonstrates that unusual diligence was exercised by the representative of the State of California to procure the attendance of Mr. Fritz as a witness at the murder trial of Petitioner Imbler." The police testified that at the time of trial, they were unable to locate Fritz after a thorough search, and no one has yet been able to find him. Moreover, petitioner's assumption that this witness would have been favorable to the defense is doubtful in light of the card introduced at the hearing, signed by Fritz at the police lineup, identifying petitioner as the killer.

▅ Petitioner contends that the police suppressed the fact that a co-employee of petitioner was unable to identify the coat dropped by the killer. This failure to identify the coat was merely one of many fruitless attempts to connect petitioner to the physical evidence in the case. Evidence of these failures would have been merely negative evidence of little probative value and could not have affected the outcome of the case. (See *Palakiko* v. *Harper,* 209 F.2d 75, 95; cf. *United States* ex rel. *Thompson* v. *Dye,* 221 F.2d 763, 769 [concurring opinion].)

▅ Petitioner contends that the state suppressed the fact that investigating police knew that Costello had issued several checks that were returned because of insufficient funds between the killing and the trial. The referee found, however, that "no threats of any character were made to Costello with regard to the aforesaid worthless checks." The evidence at the hearing shows that the police did not consider this information significant; no charges were made because of the issuance of these checks, and none were ever proposed. Neither before nor at the trial did petitioner request discovery of any of the evidence he now claims was suppressed. (See *Brady* v. *Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]; cf. *United States* v. *Consolidated Laundries Corp.,* 291 F.2d 563; *Kyle* v. *United States,*

297 F.2d 507.) ■ Although representatives of the state may not suppress substantial material evidence, they are under no duty to report sua sponte to the defendant all that they learn about the case and about their witnesses.

■ Petitioner contends that there is new evidence that undermines the prosecution's entire case. (See *In re Lindley,* 29 Cal.2d 709, 723 [177 P.2d 918]; *Jones* v. *Kentucky,* 97 F.2d 335, 338; cf. *Durley* v. *Mayo,* 351 U.S. 277, 291 [76 S.Ct. 806, 100 L.Ed. 1178, 1188] [dissent].) Some of this new evidence has already been mentioned: Costello's testimony at the reference hearing that petitioner is not the man he chased and the new expert testimony that a fingerprint found among the personal effects of the killer is not petitioner's. Moreover, Costello cast doubt on the testimony of the prosecution's other witnesses by testifying that one of them was in no position to make an identification when he saw the killer and that the other was intoxicated. Petitioner also presented several witnesses at the reference hearing to corroborate his alibi defenses. Two additional persons testified that petitioner first met Lingo, who was identified as one of the two men involved in the January 4 killing, on January 14; two additional witnesses testified that they accompanied petitioner in making the rounds of various Los Angeles taverns on the night of the killing.

Much of this evidence was thoroughly discredited at the reference hearing. As to Costello's recanting, the referee found "that while the testimony of the witness Alfred J. Costello, given at the Reference Hearing, is '. . . impeached in so many ways as to defy lucid presentation' . . . , his testimony given at Petitioner's trial for murder is supported and corroborated." Thus, Costello charged that Dunlap, the parking lot attendant who identified the killer at the trial, was so intoxicated at the time of the crime that he could not make an identification. This charge was rebutted by Dunlap's employer, who testified that he had never known this witness to drink on the job although he had checked the lot daily for three years, and by a police officer who testified that Dunlap did not appear to have been drinking when questioned on the scene.

All of the witnesses who testified at the reference hearing that they were with petitioner on the night of the killing were shown on cross-examination to be uncertain of the exact date, and some of the witnesses who testified that petitioner first met Lingo on January 14 were impeached through prior

inconsistent statements. Moreover, the testimony supporting both of the alibis was merely cumulative to testimony at the trial, for both of petitioner's alibis were corroborated there, although by a close friend who was his accomplice in the January 14 robbery attempt.

In *In re Lindley, supra,* 29 Cal.2d 709, which also involved a conviction based entirely upon identification testimony, a new suspect was discovered after the trial and a former autopsy surgeon testified that the victim had died of a heart attack. We held that such new evidence did not justify relief, and the same conclusion must be drawn here. In this case, as in *Lindley,* the new evidence "does not point unerringly to [petitioner's] innocence," but "presents only a conflict with the evidence which was before the jury" and "affords only a basis for speculation or conjecture." (29 Cal.2d at p. 724.)

Nor can a writ of *coram vobis,* which petitioner seeks in the alternative, issue on the basis of this new evidence. The writ of *coram vobis* is essentially identical to the writ of *coram nobis* except that the latter is addressed to the court in which the petitioner was convicted. (*In re Lindley,* 29 Cal.2d 709, 726 [177 P.2d 918].) These writs will be granted only if petitioner can "show that some fact existed which, without any fault or negligence on his part, was not presented to the court at the trial on the merits, and which if presented would have prevented the judgment." (*People* v. *Mendez,* 28 Cal.2d 686, 688 [171 P.2d 425]; accord, *People* v. *Reid,* 195 Cal. 249, 255 [232 P. 457, 36 A.L.R. 1435]; *In re Lindley, supra,* at p. 724-726; *People* v. *Tuthill,* 32 Cal.2d 819, 821 [198 P.2d 505].) No such showing has been made.

 Petitioner contends that he was denied adequate representation by counsel because of the absence of an effective investigation in his behalf. (Compare *In re Ochse,* 38 Cal.2d 230, 231 [238 P.2d 561]. See generally Note, *Right to Aid in Addition to Counsel for Indigent Criminal Defendants,* 47 Minn.L.Rev. 1054.) The services of the Los Angeles Public Defender's investigative staff were available, however, and an investigator worked on the case. At no time during the trial did counsel indicate that additional investigative services were needed or ask for additional time to conduct an investigation. The only support for the claim that the investigation was inadequate was the fact that an investigation after the trial by the Adult Authority and the district attor-

ney's staff turned up additional alibi witnesses that the defense had been unable to find. Whatever may be the scope of the right to adequate and effective investigation, it does not require that the investigation produce all evidence that can be shown by hindsight to have been available.

Petitioner contends finally that the trial judge erred in informing the jury in response to a juror's question of petitioner's right to an automatic appeal to this court in the event that they should impose a death penalty. The trial court failed to admonish the jury of their sole responsibility for imposing a sentence or to explain to them the nature and scope of this court's review. The jury was informed of the automatic appeal only after consent of both parties had been obtained, however, and this objection was not raised either at the trial or on the appeal.

The order to show cause is discharged and the petition is denied.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek J., concurred.

Petitioner's application for a rehearing was denied December 30, 1963.